In the Matter of the GUARDIANSHIP OF Diane Marie BRAATEN, an Incapacitated Person.

Civ. No. 920266.

Supreme Court of North Dakota.

July 1, 1993.

Legal Assistance of North Dakota, Minot, for respondent and appellant Diane Marie Braaten; argued by Richard R. LeMay.

McIntee Law Firm, Towner, for petitioners and appellees Gordon Braaten and Greg Braaten; argued by Michael S. McIntee.

MESCHKE, Justice.

Diane Marie Braaten appeals an order appointing her father and brother (the Braatens) as her co-guardians and conservators with unlimited general powers. We affirm in part, reverse in part, and remand with instructions for a limited guardianship.

Diane is a 38–year–old woman who entered Velva Public School in 1960. When she was seven, a psychological evaluation recommended that she be enrolled in a program for the educable mentally retarded. Because the Velva school had no program, Diane attended special education classes in Drake, Sawyer and, for junior and senior high school, Minot. In 1973, Diane graduated high school with a special education diploma.

Before long, Diane became a client of the Minot Vocational Adjustment Workshop, where she has repeatedly received habilitative services. Diane returned to her parents' home several times, but routinely reentered the Workshop. She married and left the Workshop in 1988, left her husband in 1990, returned to the Workshop in early 1991, and divorced. After returning to the Workshop, and with the help of the protection and advocacy unit, she obtained a 30–day restraining order to keep her parents away from her. Since then, Diane has occasionally visited a boyfriend in Bismarck, who once beat her and with whom she has engaged in anal sex, which causes medical harm to her hemorrhoids.

Currently, Diane uses the Workshop's Individualized Supported Living Arrangement (ISLA). She resides in a "supervised sheltered setting," and receives 24 hours of direct contact weekly from a residential trainer who assists her with daily household and personal activities. Except for occasional small purchases, her financial affairs have long been handled through the Workshop. At times, Diane neglects her nutritional needs and refuses guidance from others.

Diane's ISLA evaluation in 1992 reported that, in addition to mild mental retardation, she has a dependent personality and a despondency disorder. Diane receives the services of a clinical psychologist and a case manager through the North Central Human Services Center. When she cooperates, Workshop staff help her twice a day with medication.

In November 1991, Diane became severely depressed, perhaps from a medication later withdrawn. Encouraged by her physician and her therapist, Diane entered a psychiatric hospital unit in Minot, where she stayed for nearly six weeks. Against medical advice, she prematurely left the hospital, resulting in her psychiatrist's withdrawal from her case.

After returning to the Workshop ISLA, Diane refused medication and did not care for herself. When the Braatens discovered her physical deterioration in mid-February 1992, they strongly intervened. Diane was again hospitalized for five weeks and returned briefly to the Braatens' home.

The Braatens petitioned for guardianship of her person and conservatorship of her property, alleging that, "due to mental problems, Diane can not make necessary decisions about her health, nutrition and finances to properly care for herself." Under NDCC 30.1–28–03(3), the trial court appointed a visitor, a physician, and a guardian ad litem to consult with Diane and to report to the court.

Although the visitor's report did not make all of the specific recommendations and assessments that a visitor's written report "must contain," see NDCC 30.1–28–

03(6)(h), the visitor reported that, "[s]ince predicting when she may need additional help is impossible, a guardianship may be necessary, provided the guardian would recognize Diane's needs for running her own life, and try not to get involved unless she starts to deteriorate."

Her family physician advised that, "[w]ith supervision, Diane should continue to do well. She does, however, need daily supervision in order to eat properly and take her medications regularly."

The guardian ad litem advocated appointment of a limited guardian for medical purposes, but urged that a guardian for any other purpose was unwarranted. Because "Diane's financial concerns are being adequately administered," the guardian ad litem opposed appointment of a conservator.[1]

After a two-day trial, the trial court appointed the Braatens as Diane's co-guardians and conservators with unlimited general powers. The court found that "Diane Marie Braaten ... is an incapacitated person by reason of the fact that [she] has had mental deficiencies since birth," that "age, eccentricity, poverty or medical diagnosis are not alone the basis of these findings," and that "there is no available alternative resource plan that is suitable to safeguard

the health, safety or habitation of Diane Marie Braaten." *See* NDCC 30.1–28–04(2).[2] The order concluded that "the guardianship and conservatorship is necessary as the best means of providing care, supervision and habitation of Diane," and that "the powers and duties conferred upon the guardians are appropriate as the least restrictive form of intervention."

The court reasoned:

I feel that the evidence warrants the appointment and my concern is particularly Diane Braaten's inability to make the necessary decisions, particularly about her own health and about how to care for herself.

The family has been less than intrusive into the life of Diane Braaten. They have, and the testimony bears this out, allowed her latitude that is highly unusual for a family with a child of special needs. Most are over-protective and over-sheltering. The Braaten family has not been that way.

I would strongly urge the family to allow Diane just as much latitude as she can be given to enjoy a lifestyle as she now knows it.

But the court stated that it would "not place any legal restriction on the powers of

---

1. For a discussion of the advocacy role of a guardian ad litem, see *North Dakota Handbook For Guardians Ad Litem In Actions For Adjudication Of Incapacity*, 66 NDLRev 45 (1990).

2. The controlling parts of NDCC 30.1–28–04 say:
 1. The court shall exercise the authority conferred in this chapter consistent with the maximum self-reliance and independence of the incapacitated person and make appointive and other orders only to the extent necessitated by the incapacitated person's actual mental and adaptive limitations or other conditions warranting the procedure.
 2. At a hearing held under this chapter, the court shall:
 a. Hear evidence that the proposed ward is an incapacitated person. Age, eccentricity, poverty, or medical diagnosis alone is not sufficient to justify a finding of incapacity;
 b. Appoint a guardian and confer specific powers of guardianship only after finding in the record based on clear and convincing evidence that:
 (1) The proposed ward is an incapacitated person;

(2) There is no available alternative resource plan that is suitable to safeguard the proposed ward's health, safety, or habilitation which could be used instead of a guardianship;
(3) The guardianship is necessary as the best means of providing care, supervision, or habilitation of the ward; and
(4) The powers and duties conferred upon the guardian are appropriate as the least restrictive form of intervention consistent with the ability of the ward for self-care.

 ....
 5. The order appointing a guardian confers upon the guardian only those powers and duties specified in the order. In addition to any other powers conferred upon the guardian, the court's order must state whether the guardian has no authority, general authority, or limited authority to make decisions on behalf of the ward in each of the areas of residential, educational, medical, legal, vocational, and financial decisionmaking. A grant of limited authority must specify the limitations upon the authority of the guardian or the authority retained by the ward.

the guardian and conservator recognizing that future events may necessitate additional intervention by the guardians...." and that "[t]he court will not limit the powers of the Guardians as allowed in 30.1–28–04(5) NDCC. These guardians may make appropriate decisions about health care, vocational living, habitation, medical treatment and all other normal decisions."

Later, in denying Diane's motion to stay the guardianship during this appeal, the trial court contradicted its conclusions: "It is my opinion that Diane Braaten is in need of a full time guardian, not for all of her functions and activities but for certain ones that I deem to be life threatening."

Diane appeals. She disputes that she is incapacitated, that no alternative resource plan is available, and that "a guardianship is necessary and a full guardianship is the least restrictive form of intervention." The Braatens respond that they "plan on leaving Diane at the workshop as in the past and do not have any intent at this time to change her behavior except" to reduce her smoking and to keep her from the abusive boyfriend.[3]

## I. GROWTH OF LIMITED GUARDIANSHIPS

When North Dakota adopted the 1969 Uniform Probate Code (UPC) in 1973, Chapters 30.1–26 through 30.1–30 in Article V dealt with "Protection of Persons under Disability and Their Property." These chapters contained "many provisions designed to minimize or avoid the necessity of guardianship and protective proceedings, as well as provisions designed to simplify and minimize arrangements which become necessary for care of persons or their property." 6 NDCC at p. 204 (1976). Yet a guardian had "the same powers, rights, and duties respecting his ward that a parent has respecting his unemancipated minor child ..." and was "entitled to custody ... of his ward...." NDCC 30.1–28–12 (1976). The UPC did not originally authorize a limited guardianship.

Limited guardianships grew out of improving norms for treatment of developmentally disabled persons, exemplified by Judge Bruce Van Sickle's decision in *Association for Retarded Citizens v. Olson*, 561 F.Supp. 473, 494 (D.N.D.1982), *aff'd*, 713 F.2d 1384 (8th Cir.1983), deinstitutionalizing most of the persons sheltered at Grafton "unless it can be demonstrated that there is no less restrictive appropriate setting available to meet the needs of the individual." ·

A Legislative Council Judiciary Committee hurriedly studied many laws affecting developmentally disabled persons. Report

---

**3.** The Braatens assert that "[t]he record indicates that Diane's advocates have either interfered with her decision making processes or have advised her to do things to her detriment." By "advocates," the Braatens evidently designate the protection and advocacy project administered under NDCC 25–01.3. Diane's attorney acknowledges that Diane was referred to him by the project, an authorized activity of the project under NDCC 25–01.3–06. This record is devoid of evidence that indicates any impropriety by the advocacy project in responding to Diane's interests. The Braatens' assertion of detrimental interference is meritless.

The relevant parts of NDCC 25–01.3–06 say: *Authority of project....* The project may:

1. Represent persons with developmental disabilities or mental illnesses so that they may realize the rights and services to which they are entitled.

2. Investigate complaints and reports if the alleged incidents are reported to the committee or the project or if there is probable cause to believe that the incidents occurred.

3. Monitor individual habilitation or treatment plans, program plans, educational plans, facilities and programs, and all other services and care provided to persons with developmental disabilities or mental illnesses.

4. Employ counsel to represent clients to pursue legal, administrative, and other appropriate remedies to ensure the protection of the rights of persons with developmental disabilities or mental illnesses,....

5. Pursue legal, administrative, and other appropriate remedies to ensure the protection and the rights of persons with developmental disabilities or mental illnesses....

6. Sign any criminal complaint necessary to protect the interests of any person with developmental disabilities or mental illness, or group of persons with developmental disabilities or mental illnesses, who appear to have been victimized by or subjected to criminal conduct.

....

of the North Dakota Legislative Council to the Forty–Eighth Legislative Assembly at 81 (1983); Melvin L. Webster, *A Study of Guardianship in North Dakota*, 60 N.D.L.Rev. 45, 56–57 (1984). The Legislative Council recommended a bill for "a limited type of guardianship and conservatorship." Report, *supra*, at 84.

The Legislature acted and amended NDCC 30.1–28–04(1) to direct:

> The court shall exercise the authority conferred in this chapter consistent with the maximum self-reliance and independence of the incapacitated person and make appointive and other orders only to the extent necessitated by the incapacitated person's actual mental and adaptive limitations or other conditions warranting the procedure.

1983 ND Laws ch. 313, § 7. The source of this modest beginning is not apparent in the legislative history. Still, the source is evident from the close similarity of the wording to § 2–206 of the Uniform Guardianship and Protective Proceedings Act, recommended in 1982 and published in 1983 by the National Conference of Commissioners on Uniform State Laws.

"This act expands and extends UPC, Article V, Parts 1, 2, 3, and 4 to include the concept of 'limited guardianships.'" 8A U.L.A. 437 (1983). The Commissioners explained:

> The impetus for adding a "limited guardianship" concept to the guardianship and conservator provisions of the Uniform Probate Code grew out of the recommendations of an American Bar Association project, the ABA Commission on the Mentally Disabled, which, in relation to guardianship other than for minors, recommended that state laws be changed to avoid an asserted "overkill" implicit in standard guardianship proceedings. In part, this occurs, it was asserted, because a finding of non compos mentis or incompetence has been the traditional threshold for the appointment of a guardian. As a result, in consequence of the appointment of a guardian, all personal and legal autonomy is stripped from the ward and vested in the appointing court and guardian. The call for "limited guardianship" was a call for more sensitive procedures and for appointments fashioned so that the authority of the protector would intrude only to the degree necessary on the liberties and prerogatives of the protected person. In short, rather than permitting an all-or-none status, there should be an intermediate status available to the courts through which the protected person will have personal liberties and prerogatives restricted only to the extent necessary under the circumstances. The court should be admonished to look for a least-restrictive protection approach.

> . . . .

> . . . Idaho, the first state to adopt the Uniform Probate Code, and other states acting in response to requests by followers of the ABA Commission's work, have been enacting new "limited guardianship" statutes. In Idaho, the new limited guardianship legislation was enacted without specific repeal of the provisions of the Uniform Probate Code that were already part of their statutory law. Other states were enacting rather short statutes that adopted the least-intrusive or least-restrictive concept of limited guardianship in skeleton form without further elaboration. These, and other similar instances of confusion, overlap and other problems born of hasty legislative acceptance of limited guardianship language demonstrated that the National Conference of Commissioners on Uniform State Laws should adjust its formulations on guardianship to include explicit language relative to the concept of "limited guardianships." The concept of "limited guardianships" certainly is consistent with the general policy considerations upon which the Uniform Probate Code, Article V, had been based in 1969. In addition, by making limited-guardianship concepts more explicit in the act, it was and is believed that some confusion could be eliminated and that this act could replace skeleton-type acts to make the concept workable.

8A U.L.A. at 437–38. Limited guardianships thus began.

North Dakota continued to expand the concept of limited guardianships. *See* 1985 ND Laws ch. 369, §§ 3–6; ch. 370. Additional extensive amendments, "to increase due process protections" and "to ensure individual protections are not superficial," were enacted in 1989 ND Laws ch. 405 and became effective on July 1, 1990. *See* Hearings on HB 1480 Before the House Judiciary Committee, 51st N.D.Leg. (1989) (January 31, 1989 Testimony of Jo Hildebrant, State Long–Term Care Ombudsman). This bill was recommended by a "protective arrangements task force," which was set up by Legal Assistance of North Dakota, funded by the Aging Services Division of the Department of Human Services, and assisted by a county judge. Legislative history indicates that some of the 1989 amendments came from a National Conference of the Judiciary on Guardianship Proceedings for the Elderly, in June 1986, co-sponsored by the Commission on Legal Problems of the Elderly, the American Bar Association, and the National Judicial College. *See* Compilation, *Statement of Recommended Judicial Practices*, Adopted by the National Conference of the Judiciary on Guardianship Proceedings for the Elderly (June 1986) (Preface, p. viii: "Guardianship represents a drastic loss of fundamental human rights.").

North Dakota is listed among 14 states that have adopted the Uniform Guardianship and Protective Proceedings Act:

> While the North Dakota act is a substantial adoption of the major provisions of the Uniform Act, it departs from the official text in such manner that the various instances of substitution, omission, and additional matter cannot be clearly indicated by statutory notes.

8A U.L.A. Supplementary Pamphlet 128 (1993). The variations unique to this state are mostly in the 1989 amendments, which compel the use of limited guardians to a greater degree than does the uniform act.

We conclude that the appointment of general guardians for Diane in this case does not conform to the legislative mandate to maximize the autonomy of an incapacitated person by the least restrictive appointment of limited guardians.

## II. STANDARDS OF DECISION

 The present guardianship law mandates that the trial court find incapacity, lack of an alternative resource plan, and necessity of guardianship supervision, all by clear and convincing evidence, then select the least restrictive form of intervention. NDCC 30.1–28–04(2)(b). A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, although there is some evidence to support it, the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made. *Boehm v. Backes*, 493 N.W.2d 671, 674 (N.D.1992). Whether a determination is a finding of fact or a conclusion of law is decided by the reviewing court, and labels applied by the trial court are not conclusive. *In Interest of Kupperion*, 331 N.W.2d 22, 27 (N.D.1983). Accordingly, we will not disturb a trial court's findings on guardianship unless the findings are clearly erroneous.

"Treatment, services, and habilitation for developmentally disabled persons must be provided in the least restrictive appropriate setting." NDCC 25–01.2–02. "[E]ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Shelton v. Tucker*, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960). *See also Mullins v. North Dakota Dept. of Human Services*, 483 N.W.2d 160 (N.D. 1992). For guardianships, these precepts have been aptly restated:

> Guardianship ... has been considered a benevolent act by society to protect less fortunate individuals. Protection is afforded through deprivation of the ward's basic human liberties. Therefore, guardianship is a drastic measure which should only be taken if no other alternatives exist.

*Handbook for Guardians ad Litem*, 66 N.D.L.Rev. 45, 57 (1990). *See Youngberg*

*v. Romeo,* 457 U.S. 307, 322–24, 102 S.Ct. 2452, 2462, 73 L.Ed.2d 28 (1982) (mentally retarded person, committed to state institution, has constitutionally protected right of reasonable care and safety, reasonably nonrestrictive confinement, and reasonable training "to ensure his safety and to facilitate his ability to function free from bodily restraints").

■ The trial court's evidentiary standard for determining the need for a guardianship and this court's standard for appellate review of that determination are interrelated. Our precedents on the related subject of the care, treatment, and commitment of mentally ill persons, identify the conflicts between the needs for protection and liberty in imposing involuntary controls. *See In Interest of R.N.,* 492 N.W.2d 582, 584 n. 2 (N.D.1992). The intrusion upon individual liberty by the involuntary imposition of a guardianship upon an incapacitated ward sufficiently resembles the involuntary commitment of a mental health patient to call for similar careful standards of decisionmaking. *See In Interest of Gust,* 392 N.W.2d 824 (N.D.1986); *Kottke v. U.A.M.,* 446 N.W.2d 23 (N.D.1989); *In Interest of T.A.,* 472 N.W.2d 226 (N.D. 1991). To balance the competing interests of protection and liberty in these situations, our decisions expect trial courts to use a clear and convincing evidentiary standard, while our appellate review under NDRCivP 52(a) uses a more probing "clearly erroneous" standard.

### III. INCAPACITY

■ Diane's main argument is that "[t]he record does not contain evidence that questions [her] capacity to make or communicate responsible decisions concerning matters of residence, education, legal affairs, vocation or finance which endangers her health or safety." Therefore, she argues, "the trial court's conclusion of law adjudicating [her] incapacitated is not supported by the record as a whole." To the extent that Diane's argument concedes a lack of capacity for medical treatment, by omitting medical decisionmaking from her list of capabilities, we agree that complete incapacity has not been proven.

To impose a guardianship, the statute directs that the trial court first find, "based on clear and convincing evidence," that "[t]he proposed ward is an incapacitated person; ...." NDCC 30.1–28–04(2)(b)(1). An "incapacitated person" is

any adult person who is impaired by reason of mental illness, *mental deficiency,* physical illness or disability, or chemical dependency to the extent that the person *lacks capacity to make or communicate responsible decisions concerning* that person's matters of residence, education, *medical treatment,* legal affairs, vocation, finance, or other matters, or *which incapacity endangers the person's health or safety.*

NDCC 30.1–26–01(2). (emphasis supplied). One early study of our limited guardianship law identified the important criteria for determining "incapacity."

The UPC's definition of "incapacity," ... directs the attention of the court to a list of causes. This list of causes not only misdirects the attention of the court; it is also unnecessary. The cause of the proposed ward's disability is irrelevant to the determination of whether he actually needs a guardian or a conservator. The need for the appointment of either a guardian or conservator can and should be determined by examining the recent past behavior of the proposed ward, not his status.... Only behavior that actually endangers the life, health, or personal support of the proposed ward justifies the involuntary imposition of a guardianship or conservatorship.

Webster, *A Study of Guardianship in North Dakota,* 60 N.D.L.Rev. at 53–54 (footnotes omitted). Within the decade, this refinement, which focuses on an "incapacity [that] endangers the person's health or safety," was expressly added to the statutory definition of "incapacitated person." 1989 ND Laws ch. 405, § 1 amended NDCC 30.1–26–01(3) to add the phrase, "which incapacity endangers the person's health or safety."

A legislative proponent explained the intended effect of this 1989 change:

*DEFINITION OF INCAPACITY*—REVISIONS BREAK NEW GROUND WITH ITS EMPHASIS ON DETERMINING INCAPACITY.

LANGUAGE IN THE CURRENT LAW RELIES ON A DIAGNOSTIC OR MEDICAL MODEL AND REQUIRES SHOWING THE PERSON IS UNABLE FOR VARIOUS VAGUE REASONS TO PROPERLY CARE FOR THEMSELVES.

FOCUS WOULD SHIFT ON THE ABILITY OF THE WARD TO MAKE DECISIONS, AND NOT ON WHETHER THE PROPOSED WARD'S DECISIONS WOULD BE RESPONSIBLE OR PROPER. THE LAW WOULD REQUIRE THE LEGAL PROCEDURES TO PROVE THE PERSON IS INCAPABLE OF MAKING DECISIONS AND FURTHER, THAT THIS INCAPACITY IS THEN LIKELY TO CAUSE SERIOUS ILLNESS OR INJURY.

A GUARDIANSHIP WOULD BE AUTHORIZED FOR THE LEAST RESTRICTIVE FORM OF INTERVENTION CONSISTENT WITH THE ABILITY OF THE WARD FOR SELF-CARE AND SELF-DETERMINATION.

*See* Hearings on HB 1480 Before the House Judiciary Committee, 51st N.D.Leg. (1989) (January 31, 1989 Testimony of Jo Hildebrant, State Long-Term Care Ombudsman). The guardianship must be limited by the effect of the incapacity on the health and safety of the individual.

For its finding of incapacity here, the trial court identified only Diane's "mental deficiencies since birth." Title 30.1 does not define "mental deficiency." Given the relatedness of Diane's condition to the subject of title 25 on the "Mentally Ill and Retarded, ...," that title further clarifies the definition. *See* NDCC 1–01–09 ("Whenever the meaning of a word or phrase is defined in any statute, such definition is applicable to the same word or phrase wherever it occurs in the same or subsequent statutes, except when a contrary intention plainly appears."). Presumption of incompetency of a mentally deficient person is prohibited. NDCC 25–01.2–03. NDCC 25–01–01(3) defines "[m]entally defi-cient person" as "any person, ... other than a mentally ill person, who is so mentally defective as to be incapable of managing that person's affairs and to require supervision, control, and care for that person's own or the public welfare." Read together, the definitions of "mental deficiency" and "incapacity" require an incapacity that endangers the person's welfare.

By thus focusing upon a proposed ward's behavior, rather than upon a condition, this criterion carries out the legislative intent, expressed in NDCC 30.1–28–04(1), to preserve "the maximum self-reliance and independence of the incapacitated person." NDCC 30.1–28–04(1) limits an appointment "only to the extent necessitated by the incapacitated person's actual mental and adaptive limitations...."

The reports of Diane's evaluations show that Diane's mental deficiencies are neither pervasive nor endangering, except for medical matters. In 1962, a psychologist reported that Diane was suited to "the program for the Educable Mentally Retarded." An exhaustive vocational evaluation in 1979 showed that Diane was "not anywhere near ready for vocational training," but it recommended that "the best program to serve Diane's needs would be a work activity center rather than a work adjustment program." Diane's 1992 Independent Living Skills Evaluation by the Workshop concluded:

> Diane's major barrier in her life is her emotional instability. Diane should be encouraged to continue working on training to become more knowledgeable of social/sexual skills to focus on using them in every day life. Diane should also continue to learn how to plan an activity of her choice, arrange transportation and attend an activity.

> If Diane receive[s] support/treatment for her depression, she will be better able to achieve success in living completely independently in the community.

Gloria Rixen, a licensed psychologist at the North Central Human Service Center, who treated Diane, testified that "Diane would benefit from some assistance in

making decisions affecting her access to medical services, but I do not feel that she requires a full guardian." Mary Lou Holliday, Diane's caseworker at the Center for seven years, testified:

Q Based on your knowing Diane for the last eight years and your knowledge of what happens in guardianship proceedings ..., is it your opinion that Diane needs a full guardianship?

A No.

Q Is it your opinion that Diane may need some form of a limited guardianship?

A Yes.

Q And in what area would you feel that?

A I have grave concerns about Diane's medical condition. I think that by and large for the most part she can cho[o]se to go to a doctor and the workshop follows through with helping her take her medication. But sometimes when Diane gets so depressed, I think she has difficulty recognizing that she then needs medical help, and maybe it would be best if someone else were able to make that decision.

. . . .

Q [G]iven the three choices, no guardian; limited guardian; or full guardian, which one in your opinion would be the most detrimental to Diane's future?

A Full guardianship.

Q Which one would be the least detrimental?

A In my estimation limited.

In contrast, the Braatens emphasize Diane's heavy smoking, her relationship with an abusive boyfriend, and her recent hospitalizations for depression as evidence that Diane cannot care for herself, and the main reasons for a general guardianship.

The trial court's chief concern seems to have been Diane's health and medical needs. The court may have thought to caution the guardians by suggesting that they "allow Diane as much latitude as she can be given to enjoy a lifestyle as she now knows it." Still, the law commands: "A grant of limited authority must specify the limitations upon the authority of the guard-

ian or the authority retained by the ward." NDCC 30.1–28–04(5)(part). No limitations were specified in the appointment.

Evidence of smoking and an unsuccessful relationship cannot be the basis for finding complete incapacity. Everyone makes bad choices or exercises poor judgment at times. The court-appointed physician reported that, after Diane's depression treatment, "[s]he had good eye contact, answered questions readily and had a much improved outlook on life. With supervision, Diane should continue to do well." Far from indicating complete incapacity and the need for a general guardianship, the evidence shows that, with minimal guidance, Diane has the ability to largely live independently.

Diane's behavior does, however, clearly evidence her to be "so mentally defective as to be incapable of managing" her medical affairs and, for that purpose, "to require supervision, control and care for [her] own or the public welfare." NDCC 25–01–01(3). For example, Kathy Bartel, a service coordinator for the Workshop, testified that "we would be more likely to be successful with Diane if someone were there to make decisions on Diane's behalf when she's not capable of making decisions in her best interests." We conclude, therefore, that the trial court properly found, by clear and convincing evidence, that Diane is incapacitated for purposes of medical decisionmaking, but its finding of complete incapacity is not supported by convincing evidence, and is clearly erroneous.

## IV. ALTERNATIVE RESOURCE PLAN

■ The trial court may appoint a guardian only after finding, by clear and convincing evidence, that there is "no available alternative resource plan" suitable to safeguard some or all of the ward's vital interests. NDCC 30.1–28–04(2)(b)(2). "'Alternative resource plan' means a plan that provides an alternative to guardianship, using available support services and arrangements which are acceptable to the alleged incapacitated person." NDCC 30.1–26–01(1). Diane says that her "continued receipt of services from the workshop and

the North Central Human Service Center is a definite alternative resource plan to guardianship." We agree. Although the trial court found that no alternative existed, one does exist for much of Diane's decisionmaking.

As we summarized earlier, the opinions of Diane's psychologist and her caseworker projected that her Workshop living arrangement could continue satisfactorily, except for medical needs. No expert testimony contradicted those opinions. Diane has been a continual resident at the Workshop for the better part of 20 years. Except for a few instances of inadequate functioning, Diane's needs appear to have been satisfactorily met through the Workshop's services. Diane desires to preserve her independence. This kind of alternative should be bypassed only when clearly necessary.[4]

Mary Lou Holliday, Diane's caseworker, testified:

Q Mary Lou, do you have any reason to believe that Diane cannot function as she has for the last eight years with the same situation?

A I have no specific reason to believe that Diane cannot function. I think she's very capable of functioning, I think that she chooses not to do that sometimes. I think that maybe the placement Diane is in right now is not structured enough for her and I would hope to come up with something that would be more helpful to Diane. I think that the ISLA Program is a very good program and it meets a[ ]lot of Diane's needs, . . . .

Thus, Diane's relationship with the Workshop is "a plan that provides an alternative to guardianship, using available support services and arrangements which are acceptable to" Diane. NDCC 30.1–26–01(1). We conclude that the trial court was clearly erroneous in finding that there is no available alternative resource plan that, except for medical needs, could be used for Diane's decisionmaking.

## V. LEAST RESTRICTIVE INTERVENTION

■ Diane argues that "the trial court's conclusion of law that a guardianship is necessary and a full guardianship is the least restrictive form of intervention is not supported by the record as a whole." We agree.

The trial court is authorized to appoint a guardian only after finding, by clear and convincing evidence, that the guardian's powers and duties are "appropriate as the least restrictive form of intervention consistent with the ability of the ward for self-care." NDCC 30.1–28–04(2)(b)(4). "Least restrictive form of intervention" means that "the guardianship imposed on the ward must compensate for only those limitations necessary to provide the needed care and services, and that the ward must enjoy the greatest amount of personal freedom and civil liberties consistent with the ward's mental and physical limitations." NDCC 30.1–26–01(3). Given the trial court's erroneous findings about the extent of Diane's incapacity and about the availability of an alternative resource plan, an unlimited general guardianship is not "the least restrictive form of intervention."

---

**4.** The *Handbook For Guardians Ad Litem,* 66 N.D.L.Rev. at 52–53, citing NDCC 25–01.2–14, explains what an "individualized habilitation plan" should address:

Services for individuals who have developmental disabilities are determined by an individualized habilitation plan team. Any institution, facility, agency, or organization that provides services for persons who have developmental disabilities is required to have a written, individualized habilitation plan developed and put into effect for each person for whom that institution, facility, agency, or organization is primarily responsible to for delivering, or coordinating the delivery of services. One of the specific items to be addressed by the individualized habilitation plan is whether the individual with developmental disabilities appears to need a guardian. If the individual appears to need a guardian, the plan must then specify the type of protection needed by the individual based upon the individual's actual mental and adaptive limitations and other conditions which may warrant the appointment of a guardian. A guardian ad litem will therefore want to review the individual habilitation plan and team minutes reflecting the plan preparation.

(Footnote omitted).

At the hearing, the co-guardians' counsel asked Diane's treating psychologist: "What harm would it do to Diane if the Court granted the petition for a full guardianship?" She responded:

My concern is that a central issue in Diane's treatment has been her feeling that others make decisions for her and on occasion when she's felt that that was the case, she's acted out in ways that have been harmful to her.

. . . .

. . . [I]t's very important to respect Diane's wishes and to help her feel as if she is more in control of her life.

This expert testimony contradicts imposition of a general guardianship as excessive and inimical to Diane's welfare.

Diane's brother envisioned limited involvement in Diane's affairs:

Q [W]hat's your goal, your plans for this guardian—conservator?

A Well, to help prevent some of the things that have happened in the past here, for this major deal we had about a month or so ago, when she got so sick there—just try to help her along the way a[ ]little bit.

Yet he sought general powers to intervene:

Q Are you willing to accept a limited guardianship?

A No.

Q And why not?

A As my dad has explained here [earlier], that leads into different avenues that can be undermined and it's a waste of time.

Q You don't know what—how far you can go and what an issue—what side of the line an issue falls on?

A No.

This misapprehends the legal difference between a general guardianship and a limited one. The trial court mistakenly adopted this misapprehension.

By strongly intervening when she badly needed help in early 1992, the Braatens greatly aided Diane. That was commendable. A limited guardianship for medical purposes will continue to give a loving family power to aid its daughter again when the need arises, while leaving her largely free to pursue her own life, as it has in the past.

The guardianship law directs:

The order appointing a guardian confers upon the guardian only those powers and duties specified in the order. In addition to any other powers conferred upon the guardian, the court's order must state whether the guardian has no authority, general authority, or limited authority to make decisions on behalf of the ward in each of the areas of residential, educational, medical, legal, vocational, and financial decisionmaking. *A grant of limited authority must specify the limitations upon the authority of the guardian or the authority retained by the ward.*

NDCC 30.1–28–04(5) (emphasis supplied). *See Matter of Guardianship of Nelson,* 204 Mont. 90, 663 P.2d 316 (1983) (remanding to trial court for amendment of order to specify proper form of guardianship). We see no reason why the trial court cannot fashion an appropriate order that leaves no doubt about the conditions and extent of the guardians' limited powers and duties.

## VI. CONSERVATORSHIP

■ The law allows a trial court to impose conservatorship upon an adult, if "[t]he person is unable to manage his property and affairs effectively," if "[t]he person has property which will be wasted or dissipated unless proper management is provided, or [if] funds are needed for the support, care, and welfare of the person . . . and that protection is necessary or desirable to obtain or provide funds." NDCC 30.1–29–01(2)(a), (b). None of those conditions was clearly proven here.

Diane's Independent Living Skills Evaluation concluded that

[o]ne of Diane's strengths is in the skill of understanding the concept of money, she is able to use coin combinations in purchasing items and gives correct coin amounts, and identifies the paper monies. She is able to understand the concept of more than/less than, she brings enough money for purchases, writes checks independently and carries own money to perform cash transactions. Diane, however,

needs assistance in following a weekly and monthly budget, and dealing effectively with impulse buying. Diane needs assistance in paying her bills when due as she does not initiate this on her own. While this evidence might imply that Diane is "unable to manage [her] property and affairs effectively ...," NDCC 30.1–29–01(2)(a), her guardian ad litem reported that "Diane's financial concerns are being adequately administered." Diane's father testified that her trainer at the Workshop "co-sign[s] all of her checks," "takes care of her money," and "gives Diane the spending money that she's supposed to have."

No evidence of waste or mismanagement of funds by Diane or the Workshop was offered. This record does not demonstrate that financial protection is necessary or desirable.

▬ The only findings made by the trial court on Diane's ability to manage her proprietary affairs were that "Diane does not handle her own funds except for occasional small purchases and these services have been provided by others for many years," and that, therefore, "a conservator of the property of Diane ... is necessary." A trial court's findings on incapacity in a conservatorship proceeding are questions of fact that this court will not disturb unless clearly erroneous. NDRCivP 52(a); *Matter of Bo*, 365 N.W.2d 847, 850 (N.D. 1985). *See also Gessler v. Miller*, 419 N.W.2d 541, 543 (N.D.Ct.App.1988). Mere observations and conclusory statements by the trial court, without supporting evidence, are insufficient to establish the need for a conservatorship.

In view of the evidence that Diane's financial affairs are currently in order and partially controlled through her living arrangement with the Workshop, the evidence is not clear and convincing that she needs a general conservator. If a limited conservatorship is necessary to parallel and implement the limited guardianship for medical purposes, the conservatorship law directs that the court "shall exercise the authority conferred in this chapter consistent with the maximum self-reliance and independence of the protected person and make protective orders only to the extent necessitated by the protected person's actual mental and adaptive limitations and other conditions warranting the procedure." NDCC 30.1–29–08(1). The trial court was clearly erroneous in imposing a full and general conservatorship.

## VII. CONCLUSION

Although there is evidence in this record for a limited guardianship, our review of the entire record leaves us with a definite and firm conviction that a mistake has been made in imposing a general guardianship. A limited one will do. The evidence here is not clear and convincing that Diane needs a conservatorship.

We understand the Braatens' concern that future conditions may make limitations on their guardianship cumbersome. But the trial court has continuing jurisdiction "to remove limitations previously imposed." NDCC 30.1–28–13(1). The law directs a guardian to "safeguard the civil rights and personal autonomy of the ward to the fullest extent possible by ... [i]nvolving the ward as fully as is practicable in making decisions ... and ... by using the least restrictive forms of intervention...." NDCC 30.1–28–12(5)(a), (b). Even a limited guardian for medical matters must heed that statutory enjoinder. Given the primary duty of the court to adopt the least restrictive form of intervention, additional judicial action "to remove limitations previously imposed" is the better way to assure maximum self-reliance and independence of a partially incapacitated ward. *See* NDCC 30.1–28–13(1).

We reverse the trial court's order imposing a guardianship and conservatorship with general powers. We remand to the trial court with instructions to make appropriate findings, conclusions, and an order for a limited guardianship, consistent with this opinion, that imposes the least restrictive form of intervention consistent with Diane's capabilities for self-care.

LEVINE, NEUMANN and SANDSTROM, JJ., concur.

VANDE WALLE, Chief Justice, concurring specially.

I concur in the result reached by the majority opinion. I write separately to rec-

ognize there is a certain tension in the current philosophy which advocates as much freedom and independence as possible ["least restrictive appropriate setting" NDCC § 25–01.2–01(3)] for a person with incapacities, and the function of the "alternative resource" agencies ["alternative to guardianship" NDCC § 30.1–26–01(1)] which, while required to foster that freedom and independence of the person to whom they are providing services, are also to safeguard the person's "health, safety, or habilitation". NDCC § 30.1–28–04(2)(b).

This tension between, on the one hand, allowing the person freedom and independence, and, on the other hand, safeguarding the person's health and safety, requires delicate balancing by the agencies. It perhaps explains how Diane's health deteriorated until her parents intervened while, at the same time, Diane was a client of Minot Vocational Adjustment Workshop and North Dakota Central Human Services. It also explains why these agencies and the advocates involved with protection and advocacy services do not report, or are reluctant to report, the condition of the client to the parents or family of the person with disabilities. To do so might indicate the client's inability to function without family assistance, thereby compromising the client's freedom and independence which the agencies are required to foster.

I recognize the concern of the family, if not an independent guardian, for the well being of the family member with disabilities. Because it is only when the family member's health has deteriorated so greatly that the family is contacted, it is not surprising that the family would apply for a general guardianship to attempt to prevent a repeat of the health-threatening episodes.

I agree with Justice Meschke's exposition of the philosophy and purpose of the law. The application of that philosophy and purpose to the facts of this case is more difficult. It is clear to me from the record that when Diane is "down and out" it is the family that is expected to rally to her aid, expected not only by Diane but by the agencies providing the protection and advocacy services. That aid is, of course, one of the expectations we have of families. But families also expect to be informed early enough to avoid being called on to intercede only when their family member is in desperate circumstances.

Because Diane's need and the family's concern appears to be primarily health related, I agree that a limited guardianship for that purpose should be attempted before a general guardianship is imposed.