2002 ND 185

**Charles HAMILTON, Plaintiff and Appellant,**

v.

**Robert OPPEN, Defendant and Appellee.**

**and**

**Navistar, Defendant.**

**No. 20020045.**

Supreme Court of North Dakota.

Dec. 4, 2002.

Michael Ward, Eaton, Van de Streek & Ward, Minot, N.D., for plaintiff and appellant.

Lyle W. Kirmis, Zuger Kirmis & Smith, Bismarck, N.D., for defendant and appellee.

KAPSNER, Justice.

[¶ 1] Charles Hamilton appealed from a judgment entered on a jury verdict dismissing his personal injury action against Robert Oppen, and from an order denying his motion for new trial. We conclude the trial court did not err in ruling the jury had not rendered an improper quotient verdict, and did not abuse its discretion in refusing to allow Hamilton's expert witness to testify or in refusing to admit in evidence certain photographic evidence. We also conclude there is substantial evidence to support the jury verdict. We therefore affirm the judgment and order.

I

[¶ 2] Hamilton worked for Oppen on Oppen's farm near Rugby. On October 26, 1994, Hamilton, then age 21, was severely injured when he slipped and his leg got caught in an auger while he was cleaning out wet corn left in the hopper of Oppen's combine. The leg required amputation below the knee. In January 2000, Hamilton commenced this personal injury action against Oppen and Navistar International Transportation Corporation ("Navistar"), the manufacturer of the combine. Hamilton alleged Oppen was negligent in teaching him how to clean the auger and Navistar was negligent in its design of the combine and in failing to adequately warn of the dangers. Hamilton and Navistar eventually settled.

[¶ 3] The jury returned a verdict finding Hamilton 60 percent at fault for his injuries, Oppen 34 percent at fault, and "Other Persons" 6 percent at fault. The trial court polled the jury after the verdict was received and dismissed the action against Oppen. Hamilton made a motion for new trial, accompanied with affidavits from several jurors, arguing, among other things, that the jury had arrived at a quotient verdict in violation of N.D.R.Civ.P. 59(b)(2). The trial court ruled Hamilton had not established an improper quotient verdict, rejected his other allegations of error, and denied the motion. Hamilton appealed from the judgment and the order denying his motion for new trial.

II

[¶ 4] We review a trial court's denial of a N.D.R.Civ.P. 59 motion for new trial under the abuse of discretion standard. *Western Nat'l Mut. Ins. Co. v. University of North Dakota*, 2002 ND 63, ¶ 31, 643 N.W.2d 4. A trial court abuses its discretion only when it acts in an arbitrary, unreasonable, or unconscionable manner, or when its decision is not the product of a rational mental process leading to a reasoned determination. *Praus ex rel. Praus v. Mack*, 2001 ND 80, ¶ 6, 626 N.W.2d 239. The party seeking a new trial has the burden to affirmatively establish that the trial court abused its discretion. *Sollin v. Wangler*, 2001 ND 96, ¶ 8, 627 N.W.2d 159.

A

[¶ 5] Hamilton argues he is entitled to a new trial because the jury rendered an improper quotient verdict.

[¶ 6] A quotient verdict is "[a] verdict resulting from agreement whereby each juror writes down [the] amount of damages to which he thinks [the] party is entitled and such amounts are then added together and divided by [the] number of jurors." *Black's Law Dictionary* 1256 (6th ed.1990). The general rules about quotient verdicts are summarized in Annot., *Quotient Verdicts*, 8 A.L.R.3d 335, § 2, at pp. 340–41 (1966) (footnotes omitted):

Because the jurors who render a quotient verdict agree, without knowing in advance what the quotient will be, to be bound by it and to foreclose the opportunity for further discussion and for comparison and evaluation of individual jurors' positions, quotient verdicts have been considered objectionable on the grounds that they are reached through a process of chance or gambling and are not founded upon discussion, deliberation, reasoning, and collective judgment in which each juror has an opportunity for individual participation. To show that a quotient verdict has been rendered, one of the essential elements which must be established is that through an antecedent agreement the jurors bound themselves to abide by the results of the quotient process. In some jurisdictions, however, it has been held that no express agreement is required, but that a tacit understanding or an implied agreement is sufficient. Moreover, it has generally been considered sufficient to show that only part of the jury was involved in the antecedent agreement or understanding, and in a few jurisdictions it appears to have been recognized that it is enough to show that a single juror's assent to the verdict was induced by his understanding that he was bound to abide by the quotient. But if the jurors, although bound initially, subsequently abandoned their agreement to be bound by the quotient, or if the use of the quotient process was merely experimental and was never intended or assumed to be binding on any of the jurors, the verdict is not invalid as a quotient verdict.

North Dakota caselaw demonstrates it is not the act of averaging the individual jurors' estimates that is improper in a quotient verdict, but it is the prior agreement to be bound by the result of the computation that invalidates the verdict.

See Seibel v. Symons Corp., 221 N.W.2d 50, 59 (N.D.1974); Great N. Ry. Co. v. Lenton, 31 N.D. 555, 563, 154 N.W. 275, 277 (1915). The trial court in this case instructed the jury in accordance with N.D.J.I.-Civil C–74.40:

### QUOTIENT VERDICT

If you award damages to the Plaintiff, you must avoid using a "quotient" method by which the Jurors agree *in advance* to write down the amount each Juror considers to be a proper award, add the amounts together, and then divide the total amount by the number of Jurors and make the result the amount to be awarded as damages. Likewise, any other method by which the Jurors agree *in advance* to "split the difference" or to "strike a happy medium" between divergent estimates of value must be avoided. Those methods are illegal and must not be used or considered by you in arriving at any award of damages in this case.

[¶ 7] Rule 59(b)(2), N.D.R.Civ.P., specifically provides, "whenever any juror has been induced to assent to any general or special verdict or to a finding on any question submitted to the jurors by the court by a resort to the determination of chance, the misconduct may be proved by the affidavit of any one of the jurors." *See also* N.D.R.Ev. 606(b) (allowing a juror to testify "whether the verdict of the jury was arrived at by chance").

[¶ 8] After the trial, Hamilton's attorney spoke with one of the jurors, and obtained an affidavit from him outlining his recollection of the method used by the jurors to decide the verdict:

The method was agreeing to average the percentages. This seems to be against what the Judge had originally instructed, but since Wilbert, and some

of the others were of the opinion that this was of [sic] the correct method I went along with this, and agreed to be bound by the results.

There was disagreement as to the percentages, and therefore what was done, each party took the percentage that they had determined individually, these percentages were added together and divided by 10 for the number of jurors to determine what the final percentages would have been.

It was this amount that ended up being the jury verdict. I understood that this was the correct method of doing this, that I was in agreement with the verdict as being done by this method as a compromise. Personally, if I had not agreed to be bound by this method I would not agreed [sic] as I thought this decision was wrong. Some of the other jurors were of the same opinion, but we felt bound on our agreement. We had to stay with the average amount.

. . . .

Since we had all agreed that this method should be used I went along with the decision when we returned to the court room, even though I, and some of the others did not agree with the results. We thought we were bound by our agreement to go by the average of the percentages.

I would never have voted that Charles Hamilton was not to receive any damages if I had not believed I was bound by my agreement to go with the average amount. Had I not agreed in advance to be bound, the jury would probably still be sitting there if the others would not agree to give him some sort of an award.

[¶ 9] Hamilton's attorney then hired a private investigator to interview the other jurors regarding the jury deliberations. The investigator obtained affidavits from four of the other jurors. One of the jurors stated, "[i]t was decided that the average percentage would be the final, and I agreed to this." Another juror stated, "[i]n deciding the verdict in this case, the percentages were all averaged to arrive[] at the final percentages of fault. The final percentages were binding." Another explained, "[i]n deciding the verdict in this case to determine the percentage of fault, each juror took a piece of paper and wrote down what we thought the percentage should be, many times over. These percentages were added together and then divided by ten for an average percentage. We all agreed this was the way it would be done." Another juror added, "[w]e did this by, several times, taking individual anonymous surveys from each member and averaging the percentage."

[¶ 10] In support of the motion for new trial, Hamilton's attorney submitted the five juror affidavits and an affidavit from the private investigator stating in substance that none of the jurors she spoke with disputed the accuracy of the initial juror affidavit obtained by Hamilton's attorney. Hamilton's attorney did not request an evidentiary hearing, and the trial court did not hold one to question any of the jurors. The court noted the jury was given the quotient verdict instruction and concluded, based on the evidence before it, that the jury did not act "in defiance of or opposition to the Quotient Verdict instruction issued by the court."

[¶ 11] None of the juror affidavits unequivocally establish that the jury agreed in advance to be bound by the result of the computation of the percentages of fault. The initial affidavit, relied upon most heavily by Hamilton, speaks of "disagreement as to the percentages" of fault, which indicates thoughtful deliberation by the jurors and strongly suggests there was no advance agreement to use the averaging

method and to be bound by the result of the computation. The absence of a prior agreement to be bound by the result of the computation is also evidenced by the affidavits of the two jurors who stated the individual estimates of fault were averaged multiple times. The juror's statement that "[s]ince we had all agreed that this method should be used I went along with the decision when we returned to the court room" can be interpreted as a reference to the court's polling of the jurors in the courtroom and to that individual juror's feeling bound by the verdict reached by unanimous agreement.

[¶ 12] The strongest evidence that there was no agreement in advance is a question submitted to the court by the jury during its deliberations:

If we vote on # 2

Charles 62%

Robert 34%

Other 4%

Does Charles get any money? & do we need to procede [sic]?

The trial court answered "no" to each question. Twenty-seven minutes after receiving the trial court's response, the jury notified the court it had completed deliberations and returned a verdict finding Hamilton 60 percent at fault, Oppen 34 percent at fault, and "Other Persons" 6 percent at fault. The difference in the percentages between the jury's question to the court during deliberations and the final verdict demonstrates either there was no prior agreement to be bound by the computation, or if there ever was such an agreement, it was ultimately abandoned by the jurors.

[¶ 13] On this record, we conclude the trial court did not abuse its discretion in determining Hamilton did not establish that the jury rendered an improper quotient verdict entitling him to a new trial.

B

[¶ 14] Hamilton argues the trial court erred in refusing to allow his expert witness to testify.

[¶ 15] Rule 702, N.D.R.Ev., provides "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Rule 702 "envisions generous allowance of the use of expert testimony if the witnesses are shown to have some degree of expertise in the field in which they are to testify." *Anderson v. A.P.I. Co. of Minnesota*, 1997 ND 6, ¶ 9, 559 N.W.2d 204. It is the trial court's responsibility to make certain expert testimony is reliable as well as relevant. *Myer v. Rygg*, 2001 ND 123, ¶ 10, 630 N.W.2d 62. Whether a witness is qualified as an expert is a decision largely within the sound discretion of the trial court. *Id.* at ¶ 8.

[¶ 16] Hamilton identified Paul Gogulski as "an OSHA expert [who] will testify as to the duty of the employer to inform individuals of the correct method to do a job such as not to have him do it as he did and explain what the correct method he should have been instructed to do." After Gogulski was deposed in Las Vegas, Nevada, Oppen made a motion in limine to exclude Gogulski's testimony. The trial court granted the motion, concluding Gogulski was not qualified "to present expert testimony on the issue of safety required in cleaning the hopper of a combine ... [or on] the training of farm employees in the proper way to do such cleaning."

[¶ 17] Gogulski obtained a civil engineering degree from the University of Michigan in 1960 and worked on construction related projects in both the public and

private sectors throughout the United States. He had extensive experience in construction consulting and quality assurance for contractors, and at the time of the deposition, he had his own consulting forensic engineering firm in which he consults in the construction field primarily with contractors, owners and architects. Gogulski's background in farming is sparse. He had never worked in a professional capacity advising farmers. He grew up in "a rural atmosphere" in Grand Rapids, Michigan, but did not live on a farm or work on a farm. When he was a teenager, he had friends and family members who owned farms and he would visit them. His other experience with farming was "from this case particularly from talking to farmers in North Dakota and educating myself in basic farm operations." Gogulski spoke with five or six North Dakota farmers about augers and hoppers. He also researched web sites and spoke with a person who was the office supervisor for the Occupational Safety and Health Administration ("OSHA") office in Bismarck and who told him OSHA does "not enforce the statutes as they apply to agriculture," but that "the same standards should apply to farming."[1]

[¶ 18] Gogulski had concluded that, "[b]esides OSHA, numerous agricultural Safety Standards exist which could have prevented this accident from happening;" Hamilton worked in an environment on Oppen's farm "where safety standards were grossly negligent;" Oppen "failed to provide the required safety training to comply with industry standards;" by allowing his employees to clean grain tanks without shutting off the unloading auger or the combine engine, Oppen "created a serious safety hazard that contributed to the accident;" Oppen "not only failed to train or supervise his employees to perform a safe operation while working with his combines, he demonstrated negligence by his own unsafe operation of the same equipment;" Hamilton was not properly instructed in the safe use and operation of the combine; the unsafe use of combines on the Oppen farm "may have violated" numerous OSHA regulations; it is unlikely "required warning signs" were in place at the time of the accident; "[e]very farmer has a responsibility to provide a safe working environment for his employees, and to train his employees in the safe operations of his farm equipment;" and "[a]ugers are the most dangerous operation on a farm, and have proven to be the cause of the most serious accidents." Hamilton did not offer Gogulski as an expert for a more limited purpose than what his deposition and report suggested.

[¶ 19] In its order denying the motion for new trial, the trial court reasoned:

As determined by the Court prior to trial, the record establishes that Mr. Paul Gogulski knew nothing about farming, knew nothing about combines, and knew nothing about augers within the combines. The only testimony that Mr. Gogulski purportedly would have offered would have been his expertise on OSHA safety standards, but such standards

---

1. Oppen had fewer than ten employees on his farming operation. "Congress has repeatedly enacted legislation that prohibits federal funds from being used to prescribe, issue, administer or enforce any OSHA standard, rule, regulation or order that is applicable to a farming operation that does not maintain a temporary labor camp and employs ten or fewer employees." *Taft v. Derricks*, 2000 WI App. 103, ¶ 23, 235 Wis.2d 22, 613 N.W.2d 190. This prohibition was in effect at the time of Hamilton's injury. *See* Department of Labor Appropriations Act of 1994, Pub.L. No. 103–112, 107 Stat. 1082, 1087. These appropriation riders demonstrate Congress's intent to insulate small farmers from OSHA requirements. *Taft*, at ¶ 23.

were admittedly not applicable to this case. Mr. Gogulski did no independent investigation other than a few phone calls to a few farmers regarding combines. The Court finds that Mr. Gogulski had no expertise with which to assist the trier of fact in understanding the evidence or determining the facts in issue.

[¶ 20] The trial court's reasoning is rational, and its decision is not arbitrary, capricious or unconscionable. We conclude the trial court did not abuse its discretion in deciding Gogulski was not qualified as an expert and in disallowing his testimony.[2]

C

[¶ 21] Hamilton argues the trial court erred in refusing to allow in evidence several photographs of his injured leg taken at the hospital before the leg was amputated. The trial court granted Oppen's motion in limine to keep the photographs out of evidence.

[¶ 22] The admission or rejection of photographs is within the discretion of the trial court. *State v. Ash*, 526 N.W.2d 473, 477 (N.D.1995). "Even gruesome pictures are admissible for a proper proof purpose." *State v. Miller*, 466 N.W.2d 128, 132 (N.D.1991). Oppen argues the photographs were not relevant to the issue of liability and were not relevant to the issue of damages because it was undisputed that the amount of damage to the leg was so substantial the leg had to be amputated, and that the leg was only partially attached to Hamilton's body. Relevant evidence is "evidence having any ten-

dency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.D.R.Ev. 401. The photographs of Hamilton's injured leg were relevant to the issue of pain and suffering, which are elements of noneconomic damages. *See Albrecht v. Metro Area Ambulance*, 2001 ND 61, ¶ 11, 623 N.W.2d 367; N.D.C.C. § 32–03.2–04(2).

[¶ 23] Nevertheless, relevant evidence may be excluded under N.D.R.Ev. 403 if its probative value is substantially outweighed by the danger of unfair prejudice. *See State v. Klein*, 1999 ND 76, ¶ 5, 593 N.W.2d 325. In his appellate brief, Hamilton candidly describes his injured leg as resembling "hamburger." In granting the motion in limine, the trial court reasoned:

> The argument that the photographs illustrate pain and suffering has some merit, however, Mr. Hamilton and possible others can testify to the pain and suffering that he has experienced since the accident and at the time of the accident. It is my opinion that the photographs do not depict pain and suffering. They depict blood and gore which is highly prejudicial to the defendant in this case.

[¶ 24] We conclude the trial court did not abuse its discretion in ruling the probative value of the evidence was substantially outweighed by the danger of unfair prejudice, and in excluding the photographs from evidence.

---

2. It is unnecessary to decide whether we should adopt the standards for admitting expert evidence articulated by the United States Supreme Court in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co.v.*

*Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), because the result in this case is the same under those standards and our traditional standards for admitting evidence under N.D.R.Ev. 702.

### D

[¶ 25] Hamilton argues the evidence does not support the jury verdict. In reviewing a jury's findings, we view the evidence in the light most favorable to the verdict and determine only if substantial evidence supports it. *Olander Contracting Co. v. Gail Wachter Investments*, 2002 ND 65, ¶ 37, 643 N.W.2d 29. There is substantial evidence in the record to support the jury's finding that Hamilton was more at fault than Oppen for his injury.

### III

[¶ 26] The judgment and order are affirmed.

[¶ 27] DALE V. SANDSTROM, and WILLIAM A. NEUMANN, JJ., concur.

MARING, Justice, concurring in the result.

[¶ 28] I respectfully concur in the result.

[¶ 29] I believe the trial court abused its discretion in refusing to allow even one of the five photographs offered of Hamilton's injuries. The majority correctly states that the photographs of Hamilton's injured leg were relevant to the issue of pain and suffering. Compensation for pain and suffering is an element of non-economic damages which may be awarded by a trier of fact under N.D.C.C. § 32–03.2–04. In *Albrecht v. Metro Area Ambulance*, our Court stated:

"The plaintiff is entitled to recover for all forms of suffering proximately caused by tortious injury, including future suffering. The pain for which recovery is allowed includes virtually any form of conscious suffering, both emotional and physical.... Expert testimony can address pain, but frequently the physical injury itself and the kind of medical attention needed, permit or require an inference that the plaintiff suffered physically or emotionally."

2001 ND 61, ¶ 14, 623 N.W.2d 367 (quoting 2 Dan B. Dobbs, *The Law of Torts*, 1050–51 (2001)). We have recognized that the power to exclude evidence under N.D.R.Ev. 403 should be exercised sparingly. *State v. Randall*, 2002 ND 16, ¶ 15, 639 N.W.2d 439. Our Court has stated:

In determining whether to exclude evidence under Rule 403, courts should " 'give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value.' " *See id.* [*State v. Zimmerman*, 524 N.W.2d 111, 115 (N.D.1994) ] (quoting 1 Jack B. Weinstein and Margaret A. Berger, *Weinstein's Evidence* § 403[03], pp. 403–49, 403–51 (1994)). "Generally, any doubt about the existence of unfair prejudice, confusion of issues, misleading, undue delay, or waste of time, should be resolved in favor of admitting the evidence, taking necessary precautions by way of contemporaneous instructions to the jury followed by additional admonition in the charge." *Id.* Therefore, the burden is on the objecting party to show that relevant evidence should be excluded under Rule 403.

*Randall*, at ¶ 15 (citation omitted). "Prejudice alone is not sufficient to warrant exclusion under Rule 403. Virtually all evidence is prejudicial to one party or another. To justify exclusion under Rule 403, the prejudice must be unfair." 2 Jack B. Weinstein and Margaret A. Berger, *Weinstein's Federal Evidence* § 403.04[1][a], p. 403–33 (2002) (footnotes omitted). Evidence that is unfairly prejudicial is evidence that is designed to elicit a response from jurors that is not justified by the evidence. *Id.* at § 403.04[1][b]. Under Rule 403, evidence may be excluded if its probative value is "substantially out-

weighed by the danger of unfair prejudice."

[¶ 30] The trial court's reason for excluding all the photographs of Hamilton's injuries was: "It is my opinion that the photographs do not depict pain and suffering. They depict blood and gore which is highly prejudicial to the defendant in this case." The trial court never explained how these photographs created "unfair prejudice." It presumed a photograph depicting "blood and gore" was "unfairly" prejudicial. As the majority states at ¶ 22: "Even gruesome pictures are admissible for a proper proof purpose." (citation omitted). Gruesome photographic evidence of injuries is not, per se, inadmissible. "[I]f photographs are otherwise admissible for a proper purpose, they are not rendered inadmissible merely because they bring vividly to the jurors the details of a gruesome or shocking accident ... even though they may tend to arouse the passion or prejudice of the jurors." 29A Am.Jur.2d *Evidence* § 963 (1994).

[¶ 31] The test for determining whether a photograph may be shown to the jury is whether the photograph's probative value is substantially outweighed by the danger of unfair prejudice. Considering the probative value of the photographs and the philosophy behind Rule 403, the trial court could have limited the evidence to one or two photographs. Furthermore, the trial court could use other safeguards including the standard jury instruction admonishing "[y]our decision must not be influenced by sympathy or emotion." N.D.J.I. Civ. No. C–85.15 (1999).

[¶ 32] The average juror today has been exposed to a great deal of "blood and gore" through television, the media, and movies. The conclusion that the probative value of one or two photographs of the injuries sustained by Hamilton was "substantially outweighed by the danger of unfair prejudice" is not supported by reason. Pain is suffered from the time of the injury. The photographs in this case, taken in the hospital, were clearly probative of the seriousness of Hamilton's injuries, and the pain, emotion, fear, and mental anguish suffered by him at the time the injuries were sustained. I am of the opinion the trial court abused its discretion when it excluded all of the photographs of the injuries sustained by Hamilton. However, because the jury returned a verdict determining Hamilton was more than 49 percent at fault for his injuries, the jury never reached the issue of damages. Because there is no ground for granting a new trial on liability, the trial court's error is harmless error in this case.

[¶ 33] Mary Muehlen Maring

VANDE WALLE, Chief Justice, concurring in the result.

[¶ 34] The juror affidavits raise some doubt in my mind as to the possibility of a quotient verdict, but I agree the affidavits are not conclusive on the issue. Rule 59(b)(2), N.D.R.Civ.P., allows the use of juror affidavits to show an improper quotient verdict. This rule distinguishes the procedure from that recommended in *Praus v. Mack*, 2001 ND 80, ¶ 57 n. 2, 626 N.W.2d 239 and *Andrews v. O'Hearn*, 387 N.W.2d 716, 734 n. 26 (N.D.1986), in which the court suggested that when juror misconduct is discovered, investigation should cease and the matter should be presented to the court to avoid the possibility of juror taint from extra-judicial pressures. Nevertheless, while N.D.R.Civ.P. 59(b)(2) permits a jury verdict reached "by a resort to the determination of chance" to "be proved by the affidavit of any one of the jurors," it does not prohibit an evidentiary hearing on the matter. However, here no evidentiary hearing was requested.

[¶ 35]   I agree with the majority that the affidavits do not conclusively prove misconduct on the part of the jurors.   I therefore concur in the result.

[¶ 36] MARY MUEHLEN MARING, J., concurs in the result.