2005 ND 69

In Regard to the GUARDIAN-
SHIP/CONSERVATORSHIP
OF Bruce M. VAN SICKLE

Craig B. Van Sickle, Susan Cooper,
and John Van Sickle, Petitioners
and Appellees,

v.

Bruce M. Van Sickle, Respondent,

and

David Van Sickle, Appellant,

Guardian and Protective
Services, Appellee.

In Regard to the Guardianship/Conser-
vatorship of Bruce M. Van Sickle

Craig B. Van Sickle, Susan Cooper,
and John Van Sickle, Petitioners
and Appellees,

v.

Bruce M. Van Sickle, Respondent
and Appellant,

Guardian and Protective
Services, Appellee.

Nos. 20040195, 20040224.

Supreme Court of North Dakota.

April 4, 2005.

Rehearing Denied April 29, 2005.

der dismissing an application for an order to show cause why a residential decision made for the ward by the guardian, Guardian and Protective Services, Inc. ("GPS"), should not be set aside and why GPS should not be removed as guardian; and a July 8, 2004, order denying David's motion for a new trial. The Protection & Advocacy Project ("P & A") also appealed from the December 15, 2003, and July 8, 2004, orders of the court. We conclude we lack jurisdiction to consider David's appeal from the July 30, 2003, order appointing a guardian and conservator, but we decline to dismiss the appeals from the other two orders as moot because the issues are capable of repetition, yet evading review. We further conclude the district court did not err in its December 15, 2003, order dismissing the application for an order to show cause or in its July 8, 2004, order denying the motion for a new trial. We dismiss in part and affirm in part.

Melvin L. Webster, Webster & Engel, Bismarck, N.D., for petitioners and appellees.

Lynn M. Boughey, Boughey Law Firm, Minot, N.D., for David Van Sickle.

David Boeck, Protection & Advocacy Project, Bismarck, N.D., for Bruce M. Van Sickle.

LaRoy Baird III, Bismarck, N.D., for Guardian and Protective Services.

Gary R. Wolberg, Fleck, Mather & Strutz, Bismarck, N.D., and Dorothy Siemon, AARP Foundation Litigation, Washington, DC, for amicus curiae AARP; submitted on brief.

MARING, Justice.

[¶ 1] David Van Sickle appealed from a July 30, 2003, order appointing a guardian and conservator for his father, Bruce Van Sickle ("ward"); a December 15, 2003, or-

I

[¶ 2] The ward is currently 88 years old and has been diagnosed with Alzheimer's disease. In March 2003, after learning that his spouse planned to place him in a residential care center, the ward left the marital home and began residing in the Bismarck home of his friend and former secretary, Helen Monteith, who is also in her mid 80s. In April 2003, two of the ward's children, Craig Van Sickle and Susan Cooper, filed a petition seeking appointment as guardian and conservator for their father. A guardian ad litem was appointed for the ward, and the ward retained his own attorney for representation. The court appointed a visitor and a neuropsychologist to examine the ward. The court also granted the guardian ad litem's request that access to the court file be restricted to the ward, his immediate family members, the visitor, psychologists, and

others who required access. After the court granted a continuance to the ward's attorney, another of the ward's sons, David Van Sickle, filed an answer denying that the ward was incapacitated and counter-petitioned requesting that he be appointed guardian and conservator for his father. David, who is an attorney, represented himself.

[¶ 3] The ward was not present at the July 30, 2003, guardianship and conservatorship hearing. His retained attorney explained to the court that the ward preferred not to be present. The neuropsychologist concluded the ward's Alzheimer's disease was "moderate to severe." The guardian ad litem reported that the ward needed a guardian. The court-appointed visitor recommended that "a neutral third party guardian and conservator be appointed." Craig and Susan provided the court with a stipulation signed by their attorney, the guardian ad litem, and the ward's attorney agreeing that GPS should be appointed guardian and conservator for the ward. David did not sign the stipulation. When asked to respond to the stipulation, David said he agreed "it's probably appropriate to have an institution handling the ... conservatorship[,][b]ut as far as my father's personal well-being goes, I feel very strongly that a family member ought to be involved in that and that's why I filed my petition for appointment as a co-guardian." The court accepted the stipulation and appointed GPS the guardian and conservator. Before adjourning, the court also granted, without objection, the request of the ward's attorney that the case file remain sealed. Notice of entry of the findings and order appointing the guardian and conservator was given by mail to several persons, including David, on July 31, 2003.

[¶ 4] The ward continued to reside with Monteith. In September 2003, Monteith fell and fractured her pelvis, requiring that a home health care provider render assistance while she convalesced. The neuropsychologist re-evaluated the ward in October 2003 and concluded his Alzheimer's disease was in the "severe" category. GPS became concerned about Monteith's ability to continue to provide care for the ward and informed the parties of its intention to move the ward into a basic care facility. On November 3, 2003, GPS moved the ward from Monteith's home into the Family Living Center at Edgewood Vista, a basic care facility in Bismarck that accommodates persons with Alzheimer's disease.

[¶ 5] On November 18, 2003, P & A entered an appearance in the proceedings on behalf of the ward and was permitted access to the court file. P & A commenced an order to show cause proceeding against GPS, demanding that GPS be removed as guardian and conservator and that its decision to place the ward "in a locked, dementia unit of a nursing home" be set aside. A hearing was held on November 20, 2003, to determine whether the ward should be removed from Edgewood Vista immediately. Following the receipt of the visitor's report and further testimony, the court denied P & A's request for an interim order for the removal of the ward from Edgewood Vista and set the hearing on the order to show cause for December 9, 2003.

[¶ 6] At the December 9, 2003, hearing, P & A's attorney submitted a letter from David in which he stated he could not be present because a winter storm had impeded travel and requested that he be allowed to testify by telephone. The court refused to allow David to testify by telephone. After receiving testimony and exhibits, the court found that Edgewood Vista was the least restrictive alternative for placement of the ward and denied P & A's

request to remove GPS as guardian in an order dated December 15, 2003.

[¶ 7] On February 23, 2004, David submitted a pro se "Brief and Motion for a New Trial" under N.D.R.Civ.P. 59(b)(6), alleging the court's December 2003 decision "is against the law." David argued the court abused its discretion in denying him an opportunity to testify by telephone and the court's "findings are inconsistent with the evidence." David later moved for an extension of time to file a brief in support of the motion, which was granted by the court. David retained an attorney who filed a 119–page brief on his behalf raising numerous issues. Following oral argument, the district court denied the motion for new trial on July 8, 2004. David and P & A filed separate notices of appeal.

## II

[¶ 8] David has attempted to appeal from the district court's July 30, 2003, order appointing GPS as the guardian and conservator.

[¶ 9] This Court must have jurisdiction to consider the merits of an appeal. *Dietz v. Kautzman,* 2004 ND 164, ¶ 6, 686 N.W.2d 110. The right of appeal is governed solely by statute, and without any statutory basis to hear an appeal, we must dismiss the appeal. *State v. Gohl,* 477 N.W.2d 205, 207 (N.D.1991). In addition, "to call upon our power of appellate review, a timely notice of appeal must be filed." *Morley v. Morley,* 440 N.W.2d 493, 494 (N.D.1989). Under N.D.R.App.P. 4(a), a notice of appeal must be filed "within 60 days from service of notice of entry of the judgment or order being appealed." David's July 15, 2004, notice of appeal was filed almost one year after service of the notice of entry of the order appointing GPS as guardian and conservator and is, therefore, untimely. Although a timely

motion for a new trial under N.D.R.Civ.P. 59 tolls the time for filing a notice of appeal, *see Larson v. Larson,* 2002 ND 196, ¶ 6, 653 N.W.2d 869, David's February 23, 2004, motion for a new trial was not timely under N.D.R.Civ.P. 59(c) to toll the time to appeal from the July 30, 2003, order. Moreover, David's motion for a new trial specified "the December 9, 2003 decision is against the law," not that the July 30, 2003, order was erroneous.

[¶ 10] There is no statutory exception in North Dakota guardianship and conservatorship law for the timely filing of a notice of appeal. We conclude we have no jurisdiction to consider David's appeal from the July 30, 2003, order appointing GPS guardian and conservator and his allegations of error relating to that proceeding.

## III

[¶ 11] Under N.D.R.App.P. 42(c), Craig and Susan have informed us that the ward has been discharged from Edgewood Vista because "he now requires skilled nursing care" and "he is no longer in a secured unit." They argue the appeals from the December 15, 2003, and July 8, 2004, orders are, therefore, moot and should be dismissed.

[¶ 12] This Court can consider the issue of mootness in every appeal and will dismiss an appeal if the issues become moot. *In re D.P.O.,* 2005 ND 39, ¶ 8, 692 N.W.2d 128. An appeal will be dismissed as moot if no actual controversy is left to be determined. *In re E.T.,* 2000 ND 174, ¶ 5, 617 N.W.2d 470. No actual controversy exists if certain events have occurred which make it impossible for this Court to issue relief, or when the lapse of time has made the issue moot. *In re W.O.,* 2004 ND 8, ¶ 10, 673 N.W.2d 264. We will determine a moot issue, rather than dis-

miss the appeal, if the controversy is one of great public interest and involves the authority and power of public officials or if the matter is capable of repetition, yet evading review. *Id.* at ¶ 11.

[¶ 13] The ward is afflicted with Alzheimer's disease which is progressing, and he is under the control of a court-appointed guardian and conservator. The decisions of a guardian and conservator for a ward with progressive dementia or Alzheimer's disease could effectively be shielded from review because of continuing changes in the ward's condition. We conclude the issues in this case are capable of repetition, yet evading review, and we decline to dismiss the appeals from the December 15, 2003 and July 8, 2004 orders.

## IV

[¶ 14] David argues the district court erred in denying his request to participate by telephone in the December 9, 2003 hearing.

[¶ 15] Although we have recognized that a person's right to appear in a proceeding may be satisfied by allowing appearance via telephone, *see St. Claire v. St. Claire,* 2004 ND 39, ¶ 6, 675 N.W.2d 175, a person has no right to demand to appear in a proceeding and testify by telephone. *See State v. Hilgers,* 2004 ND 160, ¶¶ 22–23, 685 N.W.2d 109; *State v. Lemons,* 2004 ND 44, ¶¶ 9–11, 675 N.W.2d 148. Under N.D.R.Civ.P. 43(a), the "court may, upon the agreement of the parties, or for good cause shown in compelling and unexpected circumstances, and upon appropriate safeguards, permit presentation of testimony in open court by contemporaneous transmission from a different location." The presentation of testimony by contemporaneous transmission is not allowed for the mere convenience of a witness, and even if the parties agree to contemporaneous transmission, it must be approved by the court. N.D.R.Civ.P. 43, Explanatory Note. Here, in denying the request, the district court said:

> It isn't really practical for someone to participate in a hearing by telephone, our telephone equipment simply isn't that sophisticated and we've had problems in the past in trying to do that. We also need to make advance arrangements for that type of thing. If any party would like to call Mr. Van Sickle at some later time, we can try to arrange that but it wouldn't be possible to participate in the hearing by telephone.

No arrangements were subsequently made for the taking of David's testimony.

[¶ 16] A district court has broad discretion in determining evidentiary matters. *Hilgers,* 2004 ND 160, ¶ 22, 685 N.W.2d 109. A district court abuses its discretion when it acts in an arbitrary, unreasonable, or unconscionable manner, or when its decision is not the product of a rational mental process leading to a reasoned determination. *Praus ex rel. Praus v. Mack,* 2001 ND 80, ¶ 6, 626 N.W.2d 239. We conclude the district court did not abuse its discretion in denying David's request to participate by telephone.

## V

[¶ 17] P & A argues that GPS had no authority to place the ward in the Family Living Center at Edgewood Vista, which P & A describes as a "locked, dementia unit of a basic care facility," without first obtaining a court order. P & A relies on N.D.C.C. § 30.1–28–12(2), which provides in part that "no guardian may voluntarily admit a ward to a mental health facility or state institution for a period of more than forty-five days without a mental health commitment proceeding or other court order."

[¶ 18] In *Van Klootwyk v. Baptist Home, Inc.*, 2003 ND 112, ¶ 12, 665 N.W.2d 679 (quoting *Public Serv. Comm'n v. Wimbledon Grain Co.*, 2003 ND 104, ¶¶ 20–21, 663 N.W.2d 186), we summarized the rules of statutory construction:

> [O]ur duty is to ascertain the Legislature's intent, which initially must be sought from the statutory language itself, giving it its plain, ordinary, and commonly understood meaning. N.D.C.C. §§ 1–02–02 and 1–02–03. If statutory language is clear and unambiguous, the letter of the statute cannot be disregarded under the pretext of pursuing its spirit, because the Legislature's intent is presumed clear from the face of the statute. N.D.C.C. § 1–02–05. If statutory language is ambiguous, a court may resort to extrinsic aids, including legislative history, to interpret the statute. N.D.C.C. § 1–02–39. A statute is ambiguous if it is susceptible to meanings that are different, but rational. *Shiek v. North Dakota Workers Comp. Bureau*, 2002 ND 85, ¶ 12, 643 N.W.2d 721.

[¶ 19] The term "mental health facility" is not defined by statute. We believe a rational argument can be made that the term "mental health facility" was not intended to include a basic care facility that does not have as its primary purpose the treatment of a mental illness. We also believe a rational argument can be made that the term "mental health facility" is broad enough to include a locked dementia unit of a basic care facility. *Compare Guardianship of Muellner v. Blessing Hosp.*, 335 Ill.App.3d 1079, 270 Ill.Dec. 240, 782 N.E.2d 799, 802–803 (2002) (under Illinois law, the behavioral unit of a skilled care nursing facility qualifies as a "mental health facility" and a guardian must proceed under the Mental Health Code before placing a ward there). Therefore, it is appropriate to examine the legislative history of N.D.C.C. § 30.1–28–12(2).

[¶ 20] Before 1993, N.D.C.C. § 30.1–28–12(2) prohibited a guardian from admitting a ward to "a mental health facility, state institution, *or secured unit of a long term care facility*" without commencing a mental health commitment proceeding or obtaining a court order. (Emphasis added.) The legislature deleted "or secured unit of a long term care facility" from the statute in 1993. *See* 1993 N.D. Sess. Laws ch. 260, § 2. The legislative history reveals that the amendment was intended to eliminate the unnecessary expense of a court hearing for families and guardians before a ward could be placed in a secured unit of a long term care facility because adequate screening safeguards were already in place to assure only appropriate individuals would be admitted to those secured units. *See Hearing on S.B. 2315 Before the Senate Human Services Committee*, 53rd N.D. Legis. Sess. (January 27, 1993) (testimony of Senator Judy L. DeMers; testimony of attorney Melvin L. Webster; testimony of Shelly Warner, Executive Director of the North Dakota Long Term Care Association).

[¶ 21] We conclude a "mental health facility" within the meaning of N.D.C.C. § 30.1–28–12(2) does not include a locked and secured unit of a basic care facility. Therefore, GPS had the authority to place the ward in Edgewood Vista without first obtaining a court order.

## VI

[¶ 22] David and P & A contend the district court erred in determining the ward's placement at Edgewood Vista was the least restrictive alternative for his residence.

[¶ 23] North Dakota law demands a least-restrictive protection approach in guardianship matters so the pro-

tected person will have personal liberties and prerogatives restricted only to the extent necessary under the circumstances. *See Matter of Guardianship of Braaten,* 502 N.W.2d 512, 516 (N.D.1993). Section 30.1–28–04(1), N.D.C.C., accordingly provides that "[t]he court shall exercise the authority conferred in this chapter consistent with the maximum self-reliance and independence of the incapacitated person and make appointive and other orders only to the extent necessitated by the incapacitated person's actual mental and adaptive limitations or other conditions warranting the procedure." More specifically, N.D.C.C. § 30.1–28–12(5) provides:

When exercising the authority granted by the court, the guardian shall safeguard the civil rights and personal autonomy of the ward to the fullest extent possible by:

a. Involving the ward as fully as is practicable in making decisions with respect to the ward's living arrangements, health care, and other aspects of the ward's care; and

b. Ensuring the ward's maximum personal freedom by using the least restrictive forms of intervention and only as necessary for the safety of the ward or others.

[¶ 24] Because the "intrusion upon individual liberty by the involuntary imposition of a guardianship upon an incapacitated ward sufficiently resembles the involuntary commitment of a mental health patient to call for similar careful standards of decision making," we "expect trial courts to use a clear and convincing evidentiary standard, while our appellate review under N.D.R.Civ.P. 52(a) uses a more probing 'clearly erroneous' standard." *Braaten,* 502 N.W.2d at 518. A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, although there is some evidence to support it, the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made. *Matter of Guardianship of Renz,* 507 N.W.2d 76, 77 (N.D. 1993).

### A

[¶ 25] David argues the district court improperly placed the burden on P & A to prove that a placement other than Edgewood Vista was in the ward's best interest because GPS should have had the burden of showing no less restrictive alternative was available.

[¶ 26] We have not determined which party has the burden to prove a ward's residential placement is the least restrictive alternative available. In *Braaten,* 502 N.W.2d at 518, this Court found guidance from "[o]ur precedents on the related subject of the care, treatment, and commitment of mentally ill persons." In *In Interest of Cuypers,* 389 N.W.2d 812, 814 (N.D.1986), this Court held that, because of the legislature's specific intent to safeguard individual rights in commitment procedures, "the party attempting [a transfer from outpatient treatment to the State Hospital] must prove by clear and convincing evidence that hospitalization is the least restrictive treatment." Because of the similar interests at stake in a guardianship proceeding, we conclude that the party proposing the transfer of a ward to a more restrictive living arrangement has the burden of proving by clear and convincing evidence that the proposed placement is the least restrictive alternative available. This allocation of the burden of proof is in accord with the current trend of courts and legislatures to enhance the protections available to persons alleged to be incapable of caring for themselves or their property. *See* 1 J. Krauskopf, R. Brown, K. Tokarz, and A. Bogutz, *Elderlaw: Ad-*

*vocacy for the Aging* § 9:3 (2nd ed.1993, Supp.2005); *see also Conservatorship of Guerrero,* 69 Cal.App.4th 442, 81 Cal. Rptr.2d 541, 543 (1999); *Matter of Guardianship of Hedin,* 528 N.W.2d 567, 581 (Iowa 1995); *Matter of Sanders,* 108 N.M. 434, 773 P.2d 1241, 1245 (N.M.App.1989); *Matter of Marvin W.,* 306 A.D.2d 289, 760 N.Y.S.2d 337 (N.Y.App.Div.2003).

[¶ 27] In *O'Neill v. O'Neill,* 2000 ND 200, ¶ 3, 619 N.W.2d 855 (quoting *Helbling v. Helbling,* 541 N.W.2d 443, 445–46 (N.D. 1995)), we described the general concepts of a prima facie case and the shifting burdens of proof and of going forward with evidence:

> The plaintiff or moving party generally bears the burden of proof. If the party bearing the burden of proof presents evidence strong enough, if uncontradicted, to support a finding in her favor, that party has made a prima facie case. When the party with the burden of proof establishes a prima facie case, "the burden of going forward with the evidence ... shifts to the defendant. If the defendant can impair the prima facie quality of [i.e., rebut] the case against him, the burden [of going forward] returns to the party having the burden of proof." If the party having the burden of proof establishes a prima facie case, this party will prevail unless the opposing party offers "proof to the contrary."

[¶ 28] We conclude these principles apply to guardianship proceedings. *See, e.g., Hedin,* 528 N.W.2d at 581 (where guardianship is voluntarily imposed, once ward has made prima facie showing that ward has decision making capacity, the guardian has the burden of proving by clear and convincing evidence the ward's incompetency, but the burden of persuasion always rests on the guardian); *Sanders,* 773 P.2d at 1245 (same). Consequently, in this case GPS had the burden of establishing a pri-

ma facie case that Edgewood Vista was the least restrictive placement available for the ward. Once a prima facie case was established, the ward had the burden of going forward with evidence that impaired the prima facie case. If the ward goes forward with sufficient evidence to impair the prima facie case, the burden of going forward with the evidence shifts to GPS and GPS must prove by clear and convincing evidence that Edgewood Vista is the least restrictive alternative.

[¶ 29] David appears to contend the burden of proof was not placed on GPS because the court had P & A present its case before GPS presented its case. This may have been a variation in the order of proof, but the parties did not object to this procedure at the hearing. In any event, under N.D.R.Ev. 611(a), a court is allowed "reasonable control over the mode and order of interrogating witnesses and presenting evidence...." The "propriety of examination and cross-examination of witnesses and the order in which evidence is presented are matters largely within the sound discretion of the trial court." *Killmer v. Duchscherer,* 72 N.W.2d 650, 657 (N.D.1955). In *American Nat. Watermattress Corp. v. Manville,* 642 P.2d 1330, 1340 (Alaska 1982), the court said "most errors in the order of proof would be harmless. Very infrequently would the result of a trial be changed merely by presenting the evidence in a different order." *See also Hoffman v. North Dakota Workers Comp. Bureau,* 2002 ND 138, ¶ 15 n. 1, 651 N.W.2d 601. Here, David has not shown how he was prejudiced by the court's variation in the order of proof, and we see nothing in the record to indicate the district court improperly placed the burden of proof on P & A rather than GPS.

B

[¶ 30]   David and P & A argue the court erred in not placing the ward in the least restrictive environment, which they contend would have been in Monteith's home with appropriate private health services.

[¶ 31]   Judy Vetter, a licensed social worker and program director for GPS, testified she "considered all the options from adult foster care all the way up to nursing home care" for a residential placement for the ward.  The ward's Alzheimer's disease had been re-evaluated to be in the "severe" category and he had wandered from Monteith's residence.  Monteith had recently fallen and fractured her pelvis, necessitating assistance during her convalescence.  Monteith had been appointed as the ward's attorney in fact, established a joint checking account with the ward using about $100,000 of the ward's funds, attempted to make herself the beneficiary of the ward's life insurance benefits, attempted to obtain a passport for the ward so they could vacation in Mexico without GPS's consent, and changed some members of the ward's health care team.  GPS was also concerned that it was difficult for other family members and friends to contact and visit the ward at Monteith's apartment.

[¶ 32]   The ward's physician believed a nursing home would be the safest environment for the ward, but that he could continue to live with Monteith if certain conditions were met, including at least three weekly visits by an objective third party to ascertain Monteith's physical and mental capabilities to care for the ward.  According to Vetter, Monteith was "in total denial" of the ward's diagnosis of Alzheimer's disease.  Vetter said she had visited with Monteith and the ward in an effort to have health care professionals visit them at the apartment on an unannounced basis so they could monitor the ward's condition at different times of the day, but Monteith resisted those efforts, explaining they were "private people" and "it was [un]necessary to have a nurse checking on him."  Monteith refused respite care, a "lifeline system," and home care services "that could have amounted anywhere from 24 hours to an hour a day."  Vetter testified that home care options had been considered:

I think that option was presented to Helen Monteith and that's what I find very interesting, in that she had the chance to have additional care brought into her home so that he could stay there and she refused it and was resistive from day one in implementing even the least of services.  And so to put him into another—so let's say if you even took him and put him into an independent apartment setting, we are still going to have a period of agitation and confusion because it's going to be strange to him, he doesn't know.  So again we're moving him, so it's just another move.  Do you see what we're trying to say?  And not only that, given the type of resistance I've met with Helen and trying to find a home care agency, in my mind, that would be able to provide a level of care that would meet her standards—not the [ward's], her standards—it would be very difficult to find.

[¶ 33]   Vetter testified that adult foster care was not "an appropriate option" for the ward because of "his level of Alzheimer's dementia" and because she had contacted Burleigh County Social Services and "they were emphatic and said absolutely not."  P & A's disabilities advocate, Lorena Poppe, testified she had contacted two adult foster care providers "who said that they had openings and both expressed interest" in caring for the ward.  Vetter testified that she was familiar with those particular foster care providers, but "they

would not be able to provide the level of care that [the ward] needs."

Because you have one individual providing care for up to four people and it's not awake staff and again it's not people with the same type of disease that are there. You have people in varying degrees. One of the ladies that we have out there currently just needs physical assistance and the other person that we have is a gentleman that's in very early stages of dementia and it's nowhere near [the ward's] degree. And working with [the foster care provider] and our experience is that even though she's a good person, I mean, it's very stressful to provide 24–hour care for individuals, even on a one-on-one basis but let alone take care of four and then try to deal with the issues of behaviors and wandering.

[¶ 34] In ruling that placement at Edgewood Vista was the least restrictive alternative, the district court explained:

There's been a suggestion that somehow adult foster care should be considered and I have not heard anything that would make me believe that would be a less restrictive alternative. It would have to be provided in a locked setting. It would most likely be provided by people who don't have the training and experience of the people at Edgewood Vista. I believe that [the ward] is not a prisoner there. I believe that he has contacts. He's provided with a security net but I believe that he has an ability to be out of the facility, to have meaningful contacts and I believe that that's encouraged and that that not only is it the least restrictive but it is the best setting.

[¶ 35] We conclude the district court's finding that Edgewood Vista was the least restrictive alternative for placement of the ward is not clearly erroneous.

## C

[¶ 36] We also conclude the district court did not err in refusing to remove GPS as guardian of the ward. The record establishes that David is at odds with other family members concerning proper care for the ward. "The best interest of the ward is served by appointing a non-family member as guardian where the family members are unable to get along with each other. . . ." *Matter of Guardianship of Kelly,* 184 Ariz. 514, 910 P.2d 665, 671 (Ariz.App.1996).

## VII

[¶ 37] David argues the district court erred in denying his motion for a new trial. We review a district court's denial of a N.D.R.Civ.P. 59 motion for new trial under the abuse of discretion standard. *Hamilton v. Oppen,* 2002 ND 185, ¶ 4, 653 N.W.2d 678.

## A

[¶ 38] David presented his affidavit and Monteith's affidavit in support of his motion for a new trial. These affidavits essentially consist of testimony David and Monteith would have given if they had appeared at the December 9, 2003, hearing. The district court concluded the affidavits were not newly discovered evidence, and we agree.

In *Johnson v. Johnson,* 2001 ND 109, ¶ 6, 627 N.W.2d 779, we said:

Under N.D.R.Civ.P. 59(b)(4), the court may vacate a decision and grant a new trial if there is newly discovered material evidence that the party, with reasonable diligence, could not have discovered and produced at the trial. Before a new trial is granted on the ground of newly discovered evidence, it must be shown: 1) the evidence was discovered following trial; 2) the movant must have

exercised due diligence in discovering the evidence; 3) the evidence must not be merely cumulative or impeaching; 4) the evidence must be material and admissible; and 5) the evidence must be such that a new trial would probably produce a different result.

[¶ 39] Obviously, this evidence was not discovered after trial. The record shows Monteith was informed of the December 9 hearing date during a prior hearing, but that she did not appear. David was given an opportunity to personally appear at a later time after the December 9 hearing, but he did not take advantage of the opportunity. The parties could have called either David or Monteith as a witness, but they did not. The district court reasoned the affidavits "do not suggest the possibility there is persuasive evidence which would lead to a result different from that reached at the conclusion of the December 9 hearing."

[¶ 40] We conclude the district court did not abuse its discretion in denying the motion for new trial on the ground of newly discovered evidence.

B

[¶ 41] David also argues a new trial must be granted because the ward, the ward's attorney of record, and the guardian ad litem should have appeared at the December 9, 2003 hearing and because the case file was improperly restricted by the court.

[¶ 42] The record of the December 9 hearing reveals there was no objection to the absence of the ward or the attorneys, nor was there an objection to the restricted status of the case file. In *Kirchoffner v. Quam*, 264 N.W.2d 203, 206–07 (N.D.1978), this Court held a district court does not abuse its discretion in denying a motion for new trial when the alleged error is raised for the first time in the motion for new trial and the alleged error could have been raised during the actual trial. *See also Hefty v. Aldrich*, 220 N.W.2d 840, 846 (N.D.1974); N.D.R.Civ.P. 59(b)(7) (listing as a cause for new trial "[e]rrors in law occurring at the trial and, when required, excepted to by the party making the application"); *Henderson v. Montgomery City–County Pers. Bd.*, 695 So.2d 9, 11 (Ala.Civ.App.1996); *Conant v. Whitney*, 190 Ariz. 290, 947 P.2d 864, 867 (Ariz.App.1997); *Neiman–Marcus v. Gammage*, 191 Ga.App. 510, 382 S.E.2d 208, 209 (1989); *Bergeron v. Blake Drilling & Workover Co., Inc.*, 599 So.2d 827, 849 (La.App.1992); *Guess v. Escobar*, 26 S.W.3d 235, 241 (Mo.App.2000); *Martin v. Board of Educ. of Wappingers Cent. Sch. Dist.*, 201 A.D.2d 711, 608 N.Y.S.2d 297 (1994); *Williamson v. New Times, Inc.*, 980 S.W.2d 706, 712 (Tex.App.1998). David did not arrange to personally appear at a time after the December 9 hearing to testify or to voice any objections to the proceedings. Because these issues were raised for the first time in David's motion for a new trial, we conclude the district court did not abuse its discretion in denying the motion.

VIII

[¶ 43] We deny the requests of GPS and Craig and Susan for an award of attorney fees under N.D.R.App.P. 38 for the filing of frivolous appeals. We conclude the other issues raised by the parties are either without merit or their resolution is unnecessary for disposition of this case. We dismiss David's appeal from the July 30, 2003, order of the court. We affirm the December 15, 2003, and July 8, 2004, orders of the court.

[¶ 44] GERALD W. VANDE WALLE, C.J., WILLIAM F. HODNY, and NORMAN J. BACKES, S.J., concur.

[¶ 45] The Honorable WILLIAM F. HODNY, Surrogate Judge and the Honorable NORMAN J. BACKES, Surrogate Judge, sitting in place of SANDSTROM, J., and KAPSNER, J., disqualified.

[¶ 46] The Honorable WILLIAM A. NEUMANN, a member of the Court when this case was heard, resigned effective March 14, 2005, and did not participate in this decision.