2017 ND 247

IN the INTEREST OF B.A.C.

State of North Dakota, Petitioner and Appellee

v.

B.A.C., Respondent and Appellant

No. 20170314

Supreme Court of North Dakota.

Filed 10/17/2017

Leo A. Ryan, Jamestown, N.D., for petitioner and appellee; submitted on brief.

Andrew S. Marquart, Fargo, N.D., for respondent and appellant; submitted on brief.

Tufte, Justice.

[¶ 1] B.A.C. appeals a district court order for involuntary hospitalization and involuntary treatment with medication. We affirm the district court order, concluding that B.A.C.'s release did not moot this appeal and that the district court did not clearly err when it found by clear and convincing evidence that B.A.C. was a mentally ill person requiring inpatient treatment.

I

[¶ 2] B.A.C. was admitted to the North Dakota State Hospital on June 6, 2017. Prior to being admitted, B.A.C. drove his car into a pond near Devils Lake. He then walked barefoot away from the pond and invaded a private residence. When confronted inside, B.A.C. offered to buy the property. After B.A.C. was ordered to leave, he walked approximately two miles further before he was apprehended by police. In talking to the police officers, B.A.C. made several delusional statements about

Bill Gates, Bill Clinton, and Donald Trump, which included stating that he himself was the richest man in the world and that is why Bill Clinton wanted to kill him. The police took B.A.C. to a hospital in Devils Lake. He was then transported to the North Dakota State Hospital in Jamestown.

[¶ 3] The State Hospital petitioned the district court for involuntary commitment of B.A.C. At the State Hospital, B.A.C. had refused to take prescribed medication and expressed his wish to leave the hospital. An examination was performed by Dr. Lincoln Coombs, a doctor of psychology at the State Hospital. He found B.A.C. to be mentally ill and noted that if "untreated on an inpatient basis he would likely place himself at risk, as he did just prior to the current admission." Dr. Naveed Haider, a psychiatrist, performed an independent evaluation on B.A.C. and found him to have a primary psychotic disorder. Dr. Haider also believed that releasing B.A.C. from the hospital without treatment would likely result in self-harm.

[¶ 4] At the treatment and medication hearing, Dr. Pryatel, the treating psychiatrist at the State Hospital, stated B.A.C. was diagnosed with "unspecified schizophrenia spectrum and other psychotic disorder." He also stated that both of these diagnoses are recognized mental illnesses. Dr. Pryatel stated that B.A.C.'s illness impacts his self-control and judgment. He also stated that left untreated, B.A.C. poses a serious risk of harm to himself and others. Specifically, he testified that B.A.C. could fail to care for himself to the point of starving to death or endanger himself or others in further home invasions.

[¶ 5] On August 1, 2017, the district court ordered B.A.C. to be hospitalized at the State Hospital for 90 days, and ordered involuntary medication for that same period of time. The district court also found that the federal firearms restrictions under 18 U.S.C. § 922(d)(4) and (g)(4) applied to B.A.C. On August 15, 2017, B.A.C. was released from the State Hospital. In the Notice of Release, Dr. Pryatel explained that B.A.C. "no longer requires hospitalization at the State Hospital" and requested the court to enter an order of dismissal. On August 16, the district court ordered "the Respondent shall be discharged and released from any further involuntary civil commitment." B.A.C. now appeals the district court's hospitalization and treatment order.

## II

[¶ 6] Before addressing the merits of B.A.C.'s appeal, we must first determine whether this case has been rendered moot because B.A.C. is no longer hospitalized and the petition for involuntary commitment has been dismissed. B.A.C. argues that his appeal is not moot because his right to possess firearms remains restricted under 18 U.S.C. § 922(d)(4) and (g)(4).

[¶ 7] "This Court may consider the threshold issue of mootness in every appeal." *Interest of G.K.S.*, 2012 ND 17, ¶ 4, 809 N.W.2d 335. We dismiss an appeal as moot "if no actual controversy is left to be determined," including when "certain events have occurred which make it impossible for this Court to issue relief." *In re Guardianship/Conservatorship of Van Sickle*, 2005 ND 69, ¶ 12, 694 N.W.2d 212 (citations omitted). An appeal is moot when "a determination is sought which, when rendered, cannot have any practical legal effect upon a then-existing controversy." *Varnson v. Satran*, 368 N.W.2d 533, 535 (N.D. 1985). An appeal is not moot, however, if the district court's decision "continues to have 'collateral consequences' for the appealing party." *Interest of G.K.S.*, at ¶ 4.

[¶ 8] Under 18 U.S.C. § 922, persons who have been "adjudicated as a mental defective" or "committed to any mental institution" are prohibited from possessing firearms and ammunition. It is unlawful "for any person to sell or otherwise dispose of any firearm or ammunition to any person knowing or having reasonable cause to believe that such person . . . has been adjudicated as a mental defective or has been committed to any mental institution." 18 U.S.C. § 922(d)(4). Similarly, it is unlawful for a person "who has been adjudicated as a mental defective or who has been committed to a mental institution" to ship, transport, possess, or receive firearms or ammunition in or affecting interstate or foreign commerce. 18 U.S.C. § 922(g)(4). The district court is required to make a finding on whether § 922(d)(4) and (g)(4) apply to the subject of a proceeding in which the court orders "involuntary hospitalization or commitment to a treatment facility or involuntary treatment pursuant to chapter 25–03.1." N.D.C.C. § 62.1–02–01.2(1)(c). In its 90–day treatment order, the district court found that § 922(d)(4) and (g)(4) applied to B.A.C.

[¶ 9] This court considered a similar issue in *Interest of G.K.S.* In that case, the district court ordered a chemically dependent person, G.K.S., to receive inpatient involuntary treatment at the State Hospital. *Interest of G.K.S.*, 2012 ND 17, ¶ 2, 809 N.W.2d 335. G.K.S. was released by the State Hospital a few weeks later, and the district court entered an order of dismissal upon the State's motion. *Id.* at ¶ 3. On appeal, this Court dismissed the case as moot. *Id.* at ¶ 7. While G.K.S. argued, inter alia, that his right to possess and purchase firearms created an actual controversy, this Court held that the district court's order of dismissal vacated the involuntary commitment order. *Id.* at ¶¶ 6–7. This Court reasoned, "While a dismissal may not always resolve concerns such as those raised by G.K.S., we recognize the very significant concessions by the State on appeal, including that insufficient evidence originally supported the order." *Id.* at ¶ 7 (emphasis added). While the circumstances here are very similar to *Interest of G.K.S.*, the State in this case has not conceded that insufficient evidence originally supported the hospitalization and treatment order. Because the state's concession in *Interest of G.K.S.* led this Court to conclude that the district court's order of dismissal vacated the prior involuntary commitment order, this case is distinguishable from *Interest of G.K.S.* The order of dismissal here released B.A.C. "from any further involuntary civil commitment" fourteen days into the 90–day order. Accordingly, although shortened to fourteen days, the treatment order's finding that federal firearms restrictions apply to B.A.C. is a lasting collateral consequence of the order.

[¶ 10] Other jurisdictions have treated collateral consequences flowing from an involuntary hospitalization or commitment as an exception to mootness. *See In re Joan K.*, 273 P.3d 594, 598 (Alaska 2012) (including right to possess a firearm); *In re B.B.*, 826 N.W.2d 425, 431–32 (Iowa 2013) (considering stigma arising from adjudication and explaining that loss of right to possess firearms flows only from first involuntary commitment); *State v. Lodge*, 608 S.W.2d 910, 912 (Tex. 1980) (emphasizing stigma in applying mootness exception). Many courts will presume that collateral consequences follow from involuntary commitment. *In re McCaskill*, 603 N.W.2d 326, 329 n.3 (Minn. 1999) (collecting cases). We find these authorities persuasive. The record discloses no evidence that B.A.C. previously has been committed to a mental institution. The assessment performed on B.A.C.'s admission indicated this was his first admission to the

State Hospital and he had "an unknown past psychiatric history." Absent evidence that B.A.C. was already subject to a federal firearms restriction, we will presume that these restrictions are a collateral consequence of the district court's treatment order and there remains an actual controversy on appeal.

## III

[¶ 11] B.A.C. argues there was insufficient evidence to find that he was mentally ill or a person requiring treatment, and thus the district court erred in ordering him to be hospitalized and treated.

[¶ 12] An appeal of an order of involuntary treatment is "limited to a review of the procedures, findings, and conclusions of the lower court." N.D.C.C. § 25–03.1–29. "To balance the competing interests of protection and liberty in these situations, our decisions expect trial courts to use a clear and convincing evidentiary standard, while our appellate review under [N.D.R.Civ.P.] 52(a) uses a more probing 'clearly erroneous' standard." *In the Interest of R.N.*, 1997 ND 246, ¶ 9, 572 N.W.2d 820 (first quoting *Matter of Guardianship of Braaten*, 502 N.W.2d 512, 518 (N.D. 1993)). This Court "will affirm an order for involuntary treatment unless it is induced by an erroneous view of the law or if we are firmly convinced it is not supported by clear and convincing evidence." *In the Interest of R.N.*, at ¶ 9.

[¶ 13] "A person requires treatment if the district court finds by clear and convincing evidence: (1) the person is mentally ill, and (2) if not treated, there is a reasonable expectation that the person presents a serious risk of harm to themsel[ves], others, or property." *Interest of W.K.*, 2009 ND 218, ¶ 13, 776 N.W.2d 572. A mentally ill person is one who has an "organic, mental, or emotional disorder that substantially impairs the capacity to use self-control, judgment, and discretion in the conduct of personal affairs and social relations." N.D.C.C. § 25–03.1–02(12). A serious risk of harm refers to a substantial likelihood of:

  a. Suicide, as manifested by suicidal threats, attempts, or significant depression relevant to suicidal potential;

  b. Killing or inflicting serious bodily harm on another individual or inflicting significant property damage, as manifested by acts or threats;

  c. Substantial deterioration in physical health or substantial injury, disease, or death based upon recent poor self-control or judgment in providing one's shelter, nutrition, or personal care; or

  d. Substantial deterioration in mental health which would predictably result in dangerousness to that individual, others, or property, based upon evidence of objective facts to establish the loss of cognitive or volitional control over the individual's thoughts or actions or based upon acts, threats, or patterns in the individual's treatment history, current condition, and other relevant factors, including the effect of the individual's mental condition on the individual's ability to consent.

N.D.C.C. § 25–03.1–02(20).

[¶ 14] Here, the State Hospital established that B.A.C. had a mental illness by clear and convincing evidence. Both Dr. Coombs and Dr. Haider stated in their reports that B.A.C. had a mental illness. Additionally, Dr. Pryatel testified to diagnosing B.A.C. with "unspecified schizophrenia spectrum and other psychotic disorder," which he stated was a recognized mental illness. These diagnoses are sup-

ported by evidence of recent signs of delusion, such as B.A.C. believing Bill Clinton was going to kill him.

[¶ 15] The State Hospital has also proved that B.A.C. posed a serious risk of harm to either himself, others, or property. B.A.C. displayed extremely risky behavior by running his car into a pond, walking barefoot for long distances at night, and breaking into and entering another's house. Additionally, Dr. Coombs stated in his examination that if B.A.C. were left "untreated on an inpatient basis he would likely place himself at risk, as he did just prior to the current admission." Dr. Haider provided very similar remarks in his report. Dr. Pryatel went further, testifying that B.A.C. posed a serious risk of harm to himself and others, which could take the form of starvation or further home invasions.

[¶ 16] For these reasons, the district court did not clearly err when it found by clear and convincing evidence that B.A.C. was a mentally ill person requiring inpatient treatment.

## IV.

[¶ 17] We affirm the district court order.

[¶ 18] Jerod E. Tufte

Daniel J. Crothers

Lisa Fair McEvers

Jon J. Jensen

Gerald W. VandeWalle, C.J.